45 A.3d 1050

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Alexander KEATON, Appellant.**

**Commonwealth of Pennsylvania, Appellant**

**v.**

**Alexander Keaton, Appellee.**

**Commonwealth of Pennsylvania, Appellee**

**v.**

**Alexander Keaton, Cross–Appellant.**

Supreme Court of Pennsylvania.

Submitted March 24, 2005.

Decided May 30, 2012.

676

678

680

684

688

Stuart Brian Lev, Stephen L. Marley, III, James Joseph McHugh, Jr., Philadelphia, for Alexander Keaton.

Hugh J. Burns, Philadelphia, Amy Zapp, Harrisburg, William G. Young, Philadelphia, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice EAKIN.

Alexander Keaton appeals from the denial of guilt phase relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546; the Commonwealth cross-appeals from the grant of a new penalty phase based on trial counsel's ineffectiveness for failing to present mitigating mental health evidence.[1] We affirm in part, reverse in part, and remand for further proceedings.

In December, 1992, Keaton was charged with rape and related offenses stemming from the November, 1992 sexual assault of Nadine S. One month later, the body of Keaton's ex-girlfriend, Sherrill Ann Hall, was found. Police questioned Keaton, who was in custody for the attack on Nadine S., about Hall's death. After waiving his rights, Keaton gave a written statement incriminating himself in the killing, and he was charged with murder. Later that day, police questioned Keaton about the June, 1992 rape of another woman, Michelle B. After waiving his rights, Keaton gave a written statement in which he admitted having oral sex with this victim, but denied assaulting her. He was charged with the rape of Michelle B. and related offenses.

The Commonwealth moved to consolidate the charges for all three victims. Over defense objection, the trial court granted the motion. Prior to trial, Keaton moved to suppress his statements; the motion was denied, and Keaton was tried before a jury and found guilty of first degree murder, rape, and related offenses. At the penalty phase, the Commonwealth sought to prove the following aggravating circumstances: the murder was committed in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and the defendant had a significant history of felony convictions involving the use or threat of violence to the person, *id.*, § 9711(d)(9). Keaton sought to establish the following mitigating circumstances: he

---

1. The facts of the underlying crimes are detailed in our disposition of Keaton's direct appeal. *See Commonwealth v. Keaton*, 556 Pa. 442, 729 A.2d 529, 532–35 (1999).

was under the influence of extreme mental or emotional disturbance because of his drug addiction, *id.*, § 9711(e)(2); his age (31) at the time of the crime, *id.*, § 9711(e)(4); and any other evidence of mitigation concerning his character and record or the circumstances of the offense, *id.*, § 9711(e)(8). The jury found no mitigating circumstances and one aggravating circumstance, that the murder occurred in perpetration of the felony of rape, *id.*, § 9711(d)(6); [2] accordingly, Keaton was sentenced to death. *Id.*, § 9711(c)(1)(iv).

This Court affirmed on direct appeal, and the United States Supreme Court denied certiorari. *Keaton v. Pennsylvania,* 528 U.S. 1163, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000). Keaton timely filed a *pro se* PCRA petition and received appointed counsel, who filed an amended petition alleging all prior counsels' ineffectiveness for not raising numerous guilt and penalty phase issues. The PCRA court held a hearing on the sole issue of trial counsel's ineffectiveness for failing to investigate and present mitigating evidence at the penalty phase.[3] The PCRA court rejected Keaton's guilt phase

**2.** Although Keaton was not charged with the rape of Hall, the jury at the penalty phase concluded, based on the evidence, that he raped her before killing her. *See Keaton,* at 537 n. 3, 541 n. 8.

**3.** Contemporaneously with the hearing, Keaton filed a motion to amend his PCRA petition to include additional claims alleging: trial counsel's ineffectiveness for not· investigating the issues of time and manner of death, and for failing to secure independent forensic experts and DNA testing; trial court error in excluding 14 venirepersons from the jury after they affirmatively answered an ambiguous question on the juror questionnaire; and the unconstitutionality of his death sentence under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding execution of mentally retarded criminals violates Eighth Amendment). In this motion, he also requested a hearing on these claims and discovery regarding any biological material for DNA testing. Following the hearing, Keaton filed a motion to supplement his motion to amend, seeking to include a claim of trial counsel's ineffectiveness for failing to establish during suppression proceedings and at trial that Keaton was mentally retarded and his mental deficiencies prevented his knowing and voluntary waiver of *Miranda* rights.

Although the Rules of Criminal Procedure permit amendment of a PCRA petition "at any time" and state amendment "shall be freely allowed to achieve substantial justice[,]" Pa.R.Crim.P. 905(A), it was within the PCRA court's discretion not to address these eleventh-hour supplemental issues during the hearing. Keaton's first motion to amend was filed three days before the hearing, long after the PCRA

claims, denying him a new trial; however, the court concluded trial counsel was ineffective for failing to develop and present mitigating evidence, and granted a new penalty hearing.

Keaton appealed from the denial of his guilt phase issues the Commonwealth appealed from the grant of a new penalty phase. The PCRA court's Rule 1925(a) opinion did not address several of the issues in detail, merely stating it found Keaton's claims of guilt phase error meritless and would not further discuss them; the only penalty phase issue the court addressed was trial counsel's ineffectiveness for not investigating and presenting mitigating evidence at the penalty phase. *See* PCRA Court Opinion, 9/11/03, at 12–22. Without conclusive findings regarding whether Keaton is mentally retarded, we could not address his *Atkins* claim; accordingly, we remanded for the PCRA court to consider the claim's merits and issue an opinion detailing its findings. *See Per Curiam* Order, 1/22/09; *see also Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624, 632–33 (2005) (where both parties' experts' testimony was equivocal on issue of mental retardation, wavering between "borderline retarded" and "mentally retarded," remand for evidentiary hearing was necessary). The PCRA court complied, issuing an opinion rejecting Keaton's claim of mental retardation and holding his *Atkins* claim was meritless. *See* PCRA Court Opinion, 11/13/09, at 1, 16–18. We may now address both parties' issues on appeal.

 Our standard of review is well settled: "In addressing the grant or denial of post-conviction relief, an appellate court will consider whether the PCRA court's conclusions are

court ordered the hearing on mitigation issues only. The Commonwealth requested the hearing be continued so it could respond to Keaton's motion; however, the PCRA court opted to proceed with the hearing on mitigation issues and, if necessary, schedule another hearing or argument on the additional issues. *See* N.T. PCRA Hearing, 10/2/02, at 3. When the hearing concluded, the PCRA court ordered the parties to file post-hearing briefs including argument on Keaton's supplemental issues. *See* N.T. PCRA Hearing, 11/5/02, at 97–99. Following review of the parties' briefs and the hearing testimony, the PCRA court apparently did not find an additional hearing was necessary, as it denied all of Keaton's guilt phase claims, only awarding relief on his penalty phase mitigation claim.

supported by record evidence and are free of legal error." *Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294, 299 (2008) (citations omitted). To be entitled to PCRA relief, a petitioner must establish, by a preponderance of the evidence, his conviction or sentence resulted from one or more of the errors found in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, *id.*, § 9543(a)(3), and "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.*, § 9543(a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue. . . ." *Id.*, § 9544(a)(2). An issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding." *Id.*, § 9544(b).

 Keaton raises 13 ineffectiveness claims, an *Atkins* claim, and claims that the PCRA court erred in denying him discovery and a hearing. To be entitled to relief on an ineffectiveness claim, Keaton must prove the underlying claim is of arguable merit, counsel's performance lacked a reasonable basis, and counsel's ineffectiveness caused him prejudice. *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001); *see also Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).[4] Prejudice in the context of ineffective assistance of counsel means demonstrating there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 332 (1999). This standard is the same in the PCRA context as when ineffectiveness claims are raised on direct review. *Id.* Failure to establish any prong of the test will defeat an ineffectiveness claim. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000) (citing *Commonwealth v. Rollins*, 558 Pa. 532, 738

---

**4.** *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (enunciating "performance and prejudice" test by which to assess counsel's stewardship).

A.2d 435, 441 (1999) (ordinarily, post-conviction claim of ineffective assistance of counsel may be denied by showing petitioner's evidence fails to meet any one of three prongs for claim)).

■ An issue underlying one of Keaton's ineffectiveness claims was raised on direct appeal; specifically, we addressed his claim the prosecutor engaged in misconduct when she stated, during the guilt phase closing, that "animals don't treat each other the way this defendant treated these young women." *Keaton*, at 540. However, Keaton now alleges his counsel's ineffectiveness in connection with this issue; therefore, his claim is distinct from that raised on direct appeal and has not been previously litigated. *See Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 570, 573 (2005) (term "issue" as used in §§ 9543(a)(3) and 9544(a)(2) "refers to the discrete legal ground that was forwarded on direct appeal and would have entitled the defendant to relief"; ineffectiveness claims must be treated as wholly independent of underlying claim of error).

Regarding waiver, at the time of Keaton's trial, direct appeal, and PCRA proceedings, he was required to raise claims based on trial counsel's performance at the first opportunity when he had new counsel. *See* 42 Pa.C.S. § 9544(b); *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977).[5] Regarding layered ineffectiveness claims, this Court has held the only viable portion of such claims is that regarding appellate counsel's · failure to raise the underlying issues of trial counsel's ineffectiveness. *See Commonwealth v. Rush*, 576

5. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), abrogated *Hubbard's* rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where a defendant has new counsel, and instead held a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant*, at 738. At the time of Keaton's direct appeal, and filing of his PCRA petition, however, *Grant* was not decided; therefore, *Hubbard* still applied, and on direct appeal, Keaton was required to raise his challenges to trial counsel's performance. Failing to do so, he had to "layer" these claims in his PCRA petition, alleging appellate counsel's ineffectiveness for failing to challenge trial counsel's performance. *See Hubbard*, at 695 n. 6.

Pa. 3, 838 A.2d 651 (2003) (holding argument must be presented on each prong regarding appellate counsel's ineffectiveness); *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1021–22 (2003). "While in a number of instances, our review entails evaluation of the potential merits of waived underlying claims, such assessment is employed solely as a means of determining the viability of extant derivative claims [of appellate counsel's ineffectiveness]." *Williams*, at 300 (citing *McGill*, at 1024–25 (explaining layered claim of appellate counsel's ineffectiveness cannot be sustained where underlying claim of trial counsel's ineffectiveness lacks merit)). In his PCRA petition, which was filed before *McGill*, and appellate brief, which was filed after *McGill*, Keaton layered his ineffectiveness claims, thereby preserving the issue of appellate counsel's ineffectiveness. For the majority of his claims, he used boilerplate language and employed only cursory discussion of the ineffectiveness test's latter two prongs pertaining to appellate counsel.

Following *McGill*, there was uncertainty in cases like Keaton's, where the PCRA petition was filed pre-*McGill* and the appellate brief was filed post-*McGill*, concerning whether the pleading and proof requirements were met with respect to appellate counsel. We recently spoke to this situation in *Commonwealth v. Walker*, 613 Pa. 601, 36 A.3d 1 (2011):

> In *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945 (2008), where the appellant filed his PCRA petition pre-*McGill* and his appellate brief post-*McGill*, we stated:
>
>> *McGill* ... does not save Appellant from the obligation properly to layer his claims before this Court, or from a failure to plead and prove the ineffectiveness of *trial counsel* sufficiently under *Pierce* to satisfy the arguable merit prong for an ineffectiveness claim against appellate counsel, any of which will be fatal to his claims....
>
> *Id.*, at 956. However, we note the continuing difficulties in the transitional period following *McGill*, as the measures outlined there take hold, slowly and erratically, in the lower courts. Indeed, we are still seeing cases, such as the instant one, where the PCRA filings predated *McGill*, but

the appellate brief was filed post-*McGill*. We are also seeing post-*McGill* cases where PCRA courts have failed to allow for amendment, an important safeguard contemplated in the Rules of Criminal Procedure and emphasized in *McGill*. Given the complexities posed by these layered ineffectiveness claims, we now conclude the better practice is not to reject claims of appellate counsel's ineffectiveness on the grounds of inadequate development in the appellate brief if the deficiencies in the brief mirror those in the PCRA pleadings, unless the PCRA court invoked these deficiencies as the basis for its decision and afforded an opportunity to amend. Accordingly, *McGill's* remand procedure will remain an option in cases such as this one, and we will review the underlying claim concerning trial counsel's stewardship to determine whether remand for further development of the claim pertaining to appellate counsel is required. As held in *McGill* and *Rush*, remand is unnecessary where the appellant has not met his burden of proving the underlying claim of trial counsel's ineffectiveness.

*Walker*, at 8–9.

*Walker* detailed the history surrounding "new" direct appeal counsel's obligation to investigate and present extra-record claims in the wake of *Hubbard*, as well as the advent of relaxed waiver on collateral review following our decision in *Commonwealth v. DeHart*, 539 Pa. 5, 650 A.2d 38, 48 (1994). In short, *Hubbard* required appellate counsel to raise all claims of trial counsel's ineffectiveness (including extra-record ones) on direct appeal, or else such issues were waived on collateral review. *DeHart* subsequently made relaxed waiver available on collateral review of capital cases; direct appeal counsel could reasonably believe extra-record claims relating to trial counsel's stewardship could be addressed as claims of prior counsel's ineffectiveness at the collateral stage. As *DeHart* was decided after direct appellate counsel in *Walker* filed his brief and the case was argued, he could not reasonably have relied on relaxed waiver when he declined to pursue extra-record claims on direct appeal. *See Walker*, at 7–8. However, we held appellate counsel could have reasonably

relied upon the "extraordinary circumstances" exception, which was derived from the language of the Post Conviction Hearing Act (PCHA, the PCRA's predecessor). *Id.*, at 8. The exception provided an ineffectiveness claim could be raised where the petitioner was "able to prove the existence of other 'extraordinary circumstances' justifying his failure to raise the issue." 19 P.S. § 1180–4(b)(2) (repealed). Under that provision, global allegations of the ineffectiveness of all prior counsel constituted an "extraordinary circumstance." *Id.* (citing *Commonwealth v. McNeal*, 493 Pa. 395, 426 A.2d 606, 608 n. 2 (1981)).

Accordingly, we concluded *Walker's* appellate counsel could have reasonably believed any extra-record claims he did not raise on direct appeal could be raised under this exception on collateral review as claims of prior counsels' ineffectiveness, and we reviewed Walker's extra-record claims as claims of trial counsel's ineffectiveness. *Id.* Thus, in the narrow set of circumstances in a PCRA matter where the record reveals new appellate counsel made a conscious, reasonable decision not to pursue extra-record claims, a subsequent layered ineffectiveness claim will not be dismissed on grounds that appellate counsel acted reasonably. Rather, the very reasonableness of appellate counsel's decision is given effect by passing through to the underlying claim of trial counsel's ineffectiveness. In short, such claims are not subject to layering. *See Walker*, at 18–19 (Castille, C.J., concurring).

■ Here, *DeHart* was in effect at the time direct appeal counsel was appointed to represent Keaton, February 27, 1995, through the time the appeal was argued before us on October 20, 1998. Thus, the law permitted review of extra-record claims on collateral review under the doctrine of relaxed waiver.[6]

6. Ultimately, relaxed waiver on collateral review was abrogated in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), and *Hubbard's* ruling (which had necessitated the layering of ineffectiveness claims pertaining to trial counsel) was supplanted by *Grant*, which held ineffectiveness claims were best deferred until collateral review. However, at the time of appellate counsel's representation in Keaton's case, *Hubbard* and *DeHart* were still good law.

In examining appellate counsel's rationale for not pursuing extra-record claims, it appears he reasonably relied on relaxed waiver, as permitted by *DeHart*. At Keaton's PCRA hearing, appellate counsel testified although he could not recall with specificity, he probably had one telephone conversation with Keaton before filing his appeal; however, he did not obtain a life history from Keaton. N.T. PCRA Hearing, 11/1/02, at 27–28; N.T. PCRA Hearing, 11/5/02, at 12–13. After reading Keaton's statement, the record from the motion to suppress, the guilt and penalty phase records, and correspondence he received from Keaton, nothing indicated to him that Keaton had any mental health issues. *Id.*, at 9, 11. Furthermore, nothing in the record or in his communications with Keaton revealed Keaton was physically abused as a child. *Id.*, at 12.

Appellate counsel's affidavit, which was stipulated as evidence at the PCRA hearing, stated he had difficulty obtaining any files or records from trial counsel, and he did not have the resources, as appointed counsel, to conduct an extra-record investigation. It was his understanding that, had he requested such resources, they would not have been made available to him at the direct appeal stage; therefore, he did not request them, instead confining his review to raising all record-based claims he believed had arguable merit. Regarding extra-record claims, he stated he thought such claims were most appropriately left to PCRA proceedings, and thus he expected any extra-record claims pertaining to trial counsel's stewardship, such as the failure to investigate and present mental health mitigating evidence, would be addressed on collateral review. *See* Affidavit of Bernard J. Siegel, Esq., 10/29/02, at 1–2, ¶¶ 3, 5–7.

The record and appellate counsel's testimony suggests he performed as effectively as he could, given the circumstances. The record apparently was missing during the course of his appointment,[7] he was unable to access information, files, or

7. According to correspondence in the record, the trial record was missing for roughly 18 months, so although appellate counsel was appointed February 27, 1995, the direct appeal was not lodged until

records from trial counsel, and he lacked extensive resources to even engage in extra-record considerations. Counsel's stated belief that extra-record claims would be available in PCRA proceedings was not unreasonably erroneous, given the status of the law at the time he represented Keaton on direct appeal. Accordingly, as in *Walker*, we will give effect to the reasonableness of appellate counsel's decision by passing through layered claims regarding appellate counsel and reviewing the merits of underlying extra-record claims pertaining to trial counsel. We now turn to Keaton's issues, which are reordered for ease of discussion.

## Suppression

Keaton claims his right to counsel under the Fifth and Sixth Amendments of the United States Constitution and Art. I, § 9 of the Pennsylvania Constitution was violated when he was questioned about Hall's murder and Michelle B.'s rape while he was in custody for Nadine S.'s rape. Keaton was taken into custody for Nadine S.'s rape December 19, 1992. He invoked his right to remain silent and was not questioned about that offense; counsel was appointed to represent him, and he remained in county prison. On January 13, 1993, while he was in custody for Nadine S.'s rape, police transported him from prison to the police station and informed him they wished to question him about Hall's murder. After being given *Miranda* warnings and waiving his rights, Keaton gave an incriminating statement. Later that day, police informed Keaton they wished to question him about several unsolved sexual assault cases; the interviewer questioned Keaton about each case individually, and when Keaton indicated he had information about a case, he was given *Miranda* warnings and waived his rights. This led to Keaton's incriminating statement regarding Michelle B.'s rape. Both statements were introduced at Keaton's trial.

Keaton argues trial counsel should have moved for suppression of his statements concerning the murder and Michelle B.'s rape on the grounds they were obtained in violation of his

October 16, 1996. Appellate counsel received several extensions and ultimately filed Keaton's brief March 12, 1998.

right to counsel, instead of only challenging their voluntariness.[8] He argues trial counsel's failure to obtain suppression of the statements prejudiced him because his statement pertaining to Hall's death was the only evidence linking him to that crime. He further claims his statements concerning Hall's murder and Michelle B.'s rape prejudiced him when they were introduced as substantive evidence in the rape case pertaining to Nadine S.; without this evidence, the case merely involved a "he said/she said" credibility determination on the issue of consent. With this evidence, which portrayed Keaton as violent and dangerous, he was convicted of raping Nadine S., which conviction was then used as an aggravating circumstance in the penalty phase. Keaton further claims appellate counsel was ineffective for failing to raise trial counsel's deficient stewardship.

The Sixth Amendment right to counsel is offense-specific; it cannot be invoked once for all future prosecutions, and it only attaches at the commencement of prosecution, *i.e.,* when criminal proceedings are initiated by charge, preliminary hearing, indictment, information, or arraignment. *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Once the right has attached at the initiation of proceedings for a specific offense, the defendant may not be questioned further regarding that offense without counsel present; the right's purpose is to " 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime." *Id.,* at 177–78, 111 S.Ct. 2204 (quoting *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)) (emphasis in original). However, a defendant whose Sixth Amendment right to counsel has attached regarding one offense may be questioned about other offenses for which prosecution has not commenced, and statements made regarding other offenses are admissible in a trial for

8. The suppression motion trial counsel filed, which was denied, contended Keaton's statements were the product of police coercion. *See* N.T. Suppression Hearing, 9/7/94.

them. *Id.*, at 176, 111 S.Ct. 2204 (citing *Maine v. Moulton*, 474 U.S. 159, 180 n. 16, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)).

The Fifth Amendment right to counsel was recognized in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); this right protects a suspect's "desire to deal with police only through counsel," *McNeil*, at 178, 111 S.Ct. 2204 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)), and is not offense-specific; it attaches upon custodial interrogation, and once invoked, prohibits any further questioning of a suspect until counsel is present. *Arizona v. Roberson*, 486 U.S. 675, 686–87, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Miranda*, at 474, 86 S.Ct. 1602. For this right to attach, it must be specifically invoked by the suspect, *McNeil*, at 178, 111 S.Ct. 2204; *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); once it attaches, the suspect cannot waive it unless counsel is present. *Edwards*, at 484–85, 101 S.Ct. 1880.

Because Keaton was only charged with Nadine S.'s rape at the time he was questioned regarding the other two crimes, his Sixth Amendment right to counsel had only attached regarding Nadine S.'s rape, and questioning regarding the other crimes was permissible. Keaton contends, in the alternative, that if his Sixth Amendment right had not attached when he was questioned, his right under Art. I, § 9 had; he claims the state constitutional right is broader than the federal one, attaching at arrest rather than at formal charging. However, we have determined the right to counsel under Art. I, § 9 "is coterminous with the Sixth Amendment right to counsel for purposes of determining when the right attaches." *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162, 170 (1999). Additionally, in *Commonwealth v. Karash*, 513 Pa. 6, 518 A.2d 537 (1986), we held:

[T]he "bring-up" procedure is merely the administrative vehicle through which the movement of a prisoner is facilitated. It, in and of itself, cannot serve as the triggering factor to cause the right to counsel under the Sixth Amend-

ment to attach. . . . [W]hat is of constitutional significance is the purpose for which it is employed and when it is employed. . . . Thus we must focus upon whether the commitment to prosecute had been made prior to any of these periods of questioning.

*Id.,* at 541. As Keaton was not charged with Hall's murder and Michelle B.'s rape when he was transported, his Sixth Amendment right to counsel and the coterminous right under Art. I, § 9 had not attached regarding these offenses.

■ Keaton contends the admission of his statements concerning Hall's murder and Michelle B.'s rape violated his right to counsel in the case regarding Nadine S.'s rape, as these statements were introduced as substantive evidence to prove Nadine S.'s rape. However, he provides no case law for the proposition that a lawfully obtained statement concerning one crime cannot be introduced as substantive evidence at a consolidated trial involving additional charges. Keaton's right to counsel in the rape case regarding Nadine S. was not violated because he was never questioned about that crime. His claim appears to be that the lawfully obtained statements about Michelle B.'s rape and Hall's murder were transformed into "prior bad acts" evidence because these charges were consolidated for trial with the charge for Nadine S.'s rape. Had the jury not heard the evidence of the other rape and the murder, it would have been more apt to believe his claim that he had consensual sex with Nadine S. and would have acquitted him of that rape charge.

■ It is well settled that evidence of other crimes committed by a defendant is generally not admissible to show his criminal propensity; however, such evidence is relevant and admissible to establish the perpetrator's identity, or the existence of a common scheme or plan. *Commonwealth v. Bronshtein,* 547 Pa. 460, 691 A.2d 907, 915 (1997); *see* Pa.R.E. 404(b)(2) (evidence of other crimes, wrongs, or acts may be admitted as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). In addressing Keaton's claim on direct appeal that the charges

should not have been consolidated for trial, we noted similarities in the details of the three crimes, including the proximity of the crime scene, the manner in which the rapes were effectuated, and the victims' personal characteristics. *Keaton,* at 537. Accordingly, for the same reasons we concluded consolidation for trial was appropriate, we reject Keaton's present claim that the evidence of two of the charges tainted his defense of the third charge. *See id.,* at 537–38.

 Regarding Keaton's claim that the officers' questioning violated his Fifth Amendment right to counsel, we note the Fifth Amendment right to counsel must be specifically invoked. *McNeil,* at 178, 111 S.Ct. 2204; *Davis,* at 459, 114 S.Ct. 2350. The right was recognized in *Miranda,* where the United States Supreme Court held if a person in police custody is to be interrogated, he must first be informed "in clear and unequivocal terms" that he has the right to remain silent, anything he says can and will be used against him in court, and he has the right to consult with counsel and to have counsel present during interrogation; if he is indigent, counsel will be appointed for him. *See Miranda,* at 467–69, 471–72, 86 S.Ct. 1602. Once an individual invokes the right, all interrogation must cease until counsel is present. *Id.,* at 473–74, 86 S.Ct. 1602. Subsequently, the Court held once a suspect asserts his Fifth Amendment right to counsel, not only must the current interrogation cease, but he may not be approached for further interrogation until counsel has been made available to him, unless he himself initiates further conversation with police. *See Edwards,* at 484, 101 S.Ct. 1880. The Fifth Amendment right to counsel and the protection afforded by *Edwards* "appl[y] only when the suspect 'ha[s] expressed' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.*" *McNeil,* at 178, 111 S.Ct. 2204 (citing *Edwards,* at 484, 101 S.Ct. 1880). "It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Id.*

In *Roberson,* the Court expanded *Edwards* to include reinterrogation on an unrelated crime. *Roberson,* at 687–88, 108

S.Ct. 2093. The Court noted, "Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists." *Id.* Since *Roberson,* courts have struggled with setting bright-line rules regarding when reinterrogation was too attenuated from the initial interrogation, so as to constitute a break in custody rendering *Edwards'* presumption of involuntariness no longer applicable. Recently, the United States Supreme Court significantly narrowed the rule announced in *Edwards.* In *Maryland v. Shatzer,* 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), the Court addressed whether a break in custody ends the presumption of involuntariness established in *Edwards.* The defendant in *Shatzer* was returned to the general prison population for two and one-half years between interrogations. The Court, observing that *Edwards'* rule was "not a constitutional mandate, but judicially prescribed prophylaxis," *id.,* at 1220, concluded it had opened *Edwards'* "protective umbrella" far enough, *id.,* at 1222, and held a return to the general prison population constituted a break in custody. *Id.,* at 1220, 1223–25. Furthermore, the Court reasoned it was appropriate to specify an exact time period for purposes of determining when the *Edwards* presumption of involuntariness no longer applied after a break in custody. *See id.,* at 1223. Accordingly, the Court determined a lapse of 14 days between the initial and subsequent interrogations was sufficient to dissipate any coercive effect. *Id.* The Court explained two weeks was "plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.* Thus, in the wake of *Shatzer,* there is a bright-line rule for courts to follow in determining whether there was a sufficient break in custody as to render *Edwards'* presumption of involuntariness inapplicable.

Keaton contends he invoked his Fifth Amendment right to counsel at the initial custodial interrogation relating to the rape of Nadine S. However, it is not clear from the record

whether Keaton invoked this right; he remained silent, and counsel was appointed, but there is nothing indicating Keaton specifically invoked his right to counsel. The suppression hearing understandably focused on the circumstances surrounding Keaton's statements on January 13, 1993; no statement was made on December 19, 1992, and as counsel was not arguing for suppression on the basis of violation of the Fifth Amendment right to counsel, the issue of whether Keaton invoked this right was not explored. *See generally* N.T. Suppression Hearing, 9/7/94. The PCRA court acknowledged Keaton invoked his right to remain silent at the initial interrogation on December 19, 1992, but did not comment regarding whether he also invoked his right to counsel. *See* PCRA Court Opinion, 9/11/03, at 5. Because the parties disagree over whether the right was invoked and there is no clear answer from the record, we are constrained to remand to the PCRA court for a hearing to resolve the factual question of whether Keaton invoked his right to counsel at the December 19, 1992 interrogation. If Keaton did invoke the right, the parties then can be afforded an opportunity to provide advocacy on the effect of *Shatzer* in assessing counsel's performance; *Shatzer* was not decided at the time of Keaton's trial or direct appeal, so there was arguably a viable claim to be made under *Edwards* and *Roberson* at the time of those proceedings.[9]

9. Keaton's ineffectiveness claim is based on trial counsel's failure to rely on a case which is no longer the law. *Edwards* has been modified by *Shatzer*, and if Keaton was to be granted a new trial, based on counsel's ineffectiveness for failing to argue an *Edwards* violation, there is no guarantee Keaton's statements concerning Hall's murder and Michelle B.'s rape would be inadmissible; Keaton's counsel would still have to move for their suppression, and the Commonwealth now has available to it an argument premised upon *Shatzer*. However, in light of the United States Supreme Court's recent clarification regarding the circumstances under which *Shatzer* applies, *see Howes v. Fields*, —— U.S. ——, 132 S.Ct. 1181, 1190–91, 182 L.Ed.2d 17 (2012) (clarifying what constitutes break in custody for purposes of applying *Shatzer's* 14–day rule; distinguishing between prisoner who has not yet been convicted and sentenced and prisoner who is already serving prison term), it is questionable that Keaton's confinement in county prison, when he was not convicted or sentenced, constituted a break in custody. Thus, the parties should be afforded an opportunity for consideration and advocacy regarding the applicability of *Shatzer*. *But see Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (O'Con-

Accordingly, we reverse the PCRA court on this issue and remand for further proceedings.

Keaton further contends trial counsel was ineffective for failing to establish during the suppression hearing and at trial that Keaton was mentally retarded, brain damaged, and suffered from cognitive dysfunction which prevented him from knowingly and voluntarily waiving his *Miranda* rights. He contends his statements were thus involuntary and inadmissible, and appellate counsel was ineffective for failing to raise this issue on appeal.[10]

As discussed *infra,* in addressing Keaton's *Atkins* claim, the PCRA court properly determined Keaton is not mentally retarded; thus, his claim that trial counsel should have presented evidence of his mental retardation is baseless. Regarding his alleged brain damage and cognitive dysfunction, Keaton cites the PCRA testimony of Dr. Jonathan Mack, a neuropsychologist who evaluated him before the PCRA hearing; Dr. Mack stated his testing revealed Keaton was brain damaged, and he diagnosed Keaton with a cognitive disorder. N.T. PCRA Hearing, 11/1/02, at 16–20, 22, 24; N.T. PCRA Hearing, 11/5/02, at 27–29, 61–62.

Although the PCRA court concluded trial counsel should have investigated and presented evidence of Keaton's brain damage and cognitive disorders as mitigating evidence at the penalty phase, the same does not hold true for such evidence at the suppression hearing. There was nothing presented by Dr. Mack which suggested Keaton was incapable of understanding his rights or of voluntarily waiving them; the ex-

nor, J., concurring) ("[T]he court making the prejudice determination may not consider the effect of an objection it knows to be wholly meritless under current governing law, even if the objection might have been considered meritorious at the time of its omission.").

10. This is an extra-record claim; as discussed *supra,* appellate counsel's failure to pursue extra-record claims was reasonable. Pursuant to *Walker,* we will not dismiss a layered ineffectiveness claim on the grounds that appellate counsel acted reasonably in not pursuing extra-record claims; rather, we give effect to appellate counsel's reasonable belief (that such claims would be available on collateral review) by reviewing the merits of the underlying claim regarding trial counsel's performance. *See Walker,* at 18–19 (Castille, C.J., concurring).

pert's testimony revealed Keaton had difficulty with inhibition and impulse control, N.T. PCRA Hearing, 11/1/02, at 17, had learning disabilities, *id.*, at 23, and experienced personality changes, *id.*, at 24; nothing indicated he would not understand his rights if they were read to him, as the officers who questioned him did. The officers who took Keaton's statements observed nothing indicating he did not understand what they were saying, and there was nothing coercive about the circumstances of the interrogation, as discussed *supra*. *See* N.T. Suppression Hearing, 9/7/94, at 8–14, 29–32, 35–36. Keaton "gave a rather lengthy statement that [was] quite in depth[,]" *id.*, at 13, and was able to edit two of the questions in the interview without any prompting from the officers. *Id.*, at 15, 35. This is hardly the behavior of one who is incapable of understanding what is happening. As Keaton fails to demonstrate there was available evidence showing any cognitive disorder affected the voluntariness of his statement, this claim is meritless, and trial counsel was not ineffective.

**Guilt Phase**

Keaton claims trial and appellate counsel were ineffective for failing to challenge the exclusion for cause of 15 venirepersons who answered affirmatively to the following question on the juror questionnaire: "Do you have any beliefs, philosophical, religious or moral, that would prevent your voting to impose the death penalty in the appropriate case under the facts and under the law?" N.T. *Voir Dire*, 9/8/94, at 15; *see also* N.T. *Voir Dire*, 9/9/94, at 13; N.T. *Voir Dire*, 9/12/94, at 21. The trial court explained to trial counsel that it was going to use the questionnaire to "excuse the ones out of hand that have one of two things, either hardship or opposition to the death penalty[,]" N.T. *Voir Dire*, 9/8/94, at 16, and trial counsel agreed to this procedure. *Id.* Keaton argues this method of excluding potential jurors denied him sufficient latitude to determine whether they could put aside their personal views regarding the death penalty, so as to exclude only those who would automatically vote against it.

"The decision whether to disqualify a juror for the inability to impose a death sentence in a proper case lies in the

discretion of the trial court which will not be reversed except for abuse of that discretion." *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, 300 (1996) (citation omitted). Voicing a general objection to the death penalty or expressing conscientious or religious scruples is insufficient reason for disqualification. *Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 81 (2004) (citing *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). "Rather, exclusion for cause is warranted only if the venireperson's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotation omitted)).

The question posed to the venirepersons asked if their beliefs would *prevent* them from imposing the death penalty, even when it was called for. In the face of an affirmative answer, further query regarding whether they could set aside their beliefs would have been illogical—the word "prevent" implies they could not. In *Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441 (1997), and *Commonwealth v. Cox,* 556 Pa. 368, 728 A.2d 923 (1999), we addressed *voir dire* procedures nearly identical to the present one, and observed: "As a trial judge has wide latitude in supervising the manner in which voir dire is conducted, including the power to prevent further voir dire when response to death qualification questions prove that additional inquiry will be fruitless, the trial court [does] not err by dismissing the jurors." *Harris,* at 446 (citation omitted). We further stated, "We reject appellant's argument that trial counsel should have continued to question the excused jurors.... The trial court correctly removed jurors when it found that their views on capital punishment would 'prevent or substantially impair' the performance of their duties...." *Cox,* at 930–31. Thus, we perceive no impropriety in the dismissal of these 15 venirepersons; [11] Keaton's

11. Keaton relies on *Szuchon v. Lehman,* 273 F.3d 299 (3d Cir.2001); this reliance is misplaced. *Szuchon* involved a venireperson who, when asked if he could return a verdict of first degree murder in a capital case, replied, "I do not believe in capital punishment." *Id.,* at 329.

record-based ineffectiveness claim fails, and remand for development of his claim regarding appellate counsel is unnecessary. *Walker*, at 9; *McGill*, at 1023.

Keaton claims he was denied his rights to due process and counsel when the trial court denied his motion for change of court-appointed trial counsel without holding a hearing; he claims appellate counsel was ineffective for failing to raise this issue. Prior to the start of the third day of jury selection, Keaton told the trial court he wished to dismiss court-appointed counsel as his attorney and hire his own lawyer, which he admittedly could not afford to do. Keaton stated he felt trial counsel did not have his interests at heart because he advised Keaton to plead guilty in exchange for a life sentence and failed to provide him with part of the preliminary hearing transcript. Trial counsel responded that he merely conveyed the Commonwealth's offer of a life sentence to Keaton, as he was required to do, and had not suggested Keaton enter a plea; counsel also informed the court Keaton was a difficult client. The trial court noted Keaton filed a *pro se* "petition for withdrawal of counsel" two months prior to trial, which a different judge denied following an *in camera* hearing. As Keaton's contention at trial was the same as this prior argument—counsel would not represent him to the best of counsel's ability—and Keaton offered nothing new in support of his allegation, the trial court concluded Keaton had not demonstrated the attorney-client relationship had deteriorated to the point that counsel could not effectively represent him. *See* N.T. *Voir Dire*, 9/12/94, at 4–13.

 "A motion for change of counsel by a defendant for whom counsel has been appointed shall not be granted except for substantial reasons." Pa.R.Crim.P. 122(C). "To satisfy this standard, a defendant must demonstrate that he has an irreconcilable difference with counsel that precludes

Challenge for cause was granted without further inquiry whether this belief would render him incapable of following the law. *Id.*, at 329–30. Here, the venirepersons did not merely state their beliefs, but unequivocally stated these beliefs would *prevent* them from imposing a death sentence.

counsel from representing him. The decision of whether to appoint new counsel lies within the sound discretion of the trial court." *Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139, 1150 (2000) (citations omitted). After hearing Keaton's reasons for wanting different counsel and hearing counsel's side of the issue, the trial court concluded although Keaton and trial counsel obviously disliked working together, *see* N.T. *Voir Dire,* 9/12/94, at 4, 6–7, 12, there was no reason counsel was incapable of zealously representing Keaton. Neither the Rules of Criminal Procedure nor our case law requires a defendant be afforded a hearing every time he requests a change of counsel, and we decline to impose such a requirement. As the record reveals no abuse of discretion by the trial court in summarily denying Keaton's request, the PCRA court properly ruled this claim was meritless. Accordingly, remand for further development of the record-based claim as it pertains to appellate counsel is unnecessary. *Walker,* at 9; *McGill,* at 1023.

■ Keaton claims trial counsel was ineffective for failing to properly investigate and litigate the issue of the time and manner of Hall's death. He contends counsel should have secured independent forensic pathology and entomology experts, as well as DNA testing of any available biological evidence. He argues if trial counsel could have demonstrated Hall died late in December, instead of November 1st or 2nd as the Commonwealth theorized, it would have refuted the evidence against him, as he was incarcerated for a different offense on December 19th. He further claims an investigation of biological and physical evidence was necessary to determine the validity of his claim that he and Hall engaged in consensual sexual asphyxiation, and whether Hall had sex with someone other than him immediately prior to her death; he also contends counsel should have looked for others with motive to kill Hall. Keaton notes under *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), trial counsel was entitled to funds to consult with experts and conduct an investigation; he also claims appellate counsel was ineffective

for failing to pursue these issues on direct appeal, mistakenly believing they were better left for PCRA litigation.[12]

This Court has stated:

When a defendant claims that some sort of expert testimony should have been introduced at trial, the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence. Further, trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony.

*Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1265 (1994) (citation omitted).

Keaton baldly asserts trial counsel should have hired a forensic pathologist and entomologist; he fails to identify such witnesses or articulate what helpful evidence an investigation could have unearthed.[13] The medical examiner testified at trial that the advanced state of decomposition in which Hall's body was found was consistent with death occurring at the time of her disappearance in early November, *see* N.T. Trial, 9/14/94, at 48–49; however, on cross-examination, trial counsel was able to elicit the examiner's admission that the body was so badly decomposed, he could not determine the exact date of death, which he conceded could have been early December or November. *Id.*, at 53–54. Furthermore, given the fact the ligature around Hall's neck was tied so tightly it had to be cut off during the autopsy, the value of expert testimony that the asphyxiation was consensual is dubious. *Id.*, at 28–29, 47. Likewise, the body's advanced state of decomposition made it impossible to recover any biological evidence of sexual activity,

12. *Grant* was not yet decided at the time of Keaton's direct appeal. *See* n. 5, *supra.* As appellate counsel's failure to investigate extra-record issues was reasonable, *see* n. 11, *supra*, we will review the merits of the claim regarding trial counsel's ineffectiveness.

13. In conjunction with this claim, Keaton asserts the PCRA court erred in denying his request for DNA testing pursuant to 42 Pa.C.S. § 9543.1 and for an evidentiary hearing. Section 9543.1 permits an inmate sentenced to death to make a written motion to the sentencing court for DNA testing on specific evidence related to the investigation or prosecution that resulted in the conviction. *Id.*, § 9543.1(a)(1).

*id.*, at 47; thus, DNA testing to ascertain whether Hall had sex with another man would have been futile. Accordingly, Keaton's claim under 42 Pa.C.S. § 9543.1 fails; likewise, he is not entitled to an evidentiary hearing on this issue, as such hearings are not intended to serve as fishing expeditions for further evidence trial counsel should have discovered. As Keaton fails to demonstrate trial counsel's ineffectiveness, he is not entitled to relief on this claim.

Keaton claims trial counsel was ineffective for failing to present character evidence of Keaton's reputation for peacefulness and non-violence during the guilt phase. At a side-bar immediately prior to the penalty phase, the trial court noted its incorrect assumption that trial counsel did not present character witnesses because Keaton had a prior record that counsel did not want revealed on cross-examination of these witnesses; upon learning Keaton had no prior record, the court asked counsel if he had discussed presenting character witnesses with Keaton. Trial counsel replied his reason for not presenting them was his concern that four other outstanding rape cases would be introduced as impeachment evidence if he opened the door regarding Keaton's peaceful reputation. N.T. Sentencing, 9/22/94, at 14. In ruling on this issue, the PCRA court held because the Commonwealth's case was neither weak nor based solely on its witnesses' credibility, character evidence was not critical to the defense's success. PCRA Court Opinion, 9/11/03, at 10 (citing *Commonwealth v. Weiss*, 530 Pa. 1, 606 A.2d 439, 442 (1992)).

Keaton argues character evidence was critical because the rape cases hinged entirely on the complaining witnesses' testimony, and the homicide case was based upon the condition in which the victim's body was found and on Keaton's police statement, which was largely exculpatory.[14] Thus, Keaton claims trial counsel's failure to present character evidence prejudiced his case. He cites the PCRA testimony and affida-

14. In his statement, Keaton claimed Hall's body was found undressed with a pant leg tied around the neck because he and Hall engaged in consensual sex involving erotic asphyxiation; he denied any intent to kill or harm Hall, and said when he left the scene, she was still alive, but had passed out. N.T. Trial, 9/14/94, at 73–75.

vits of his two sisters, his aunt, and a family friend, who would have testified regarding his reputation for peacefulness and non-violence. N.T. PCRA Hearing, 10/2/02, at 55, 84–86, 88; N.T. PCRA Hearing, 10/11/02, at 162; Affidavit of Denise Keaton, 10/24/00, at ¶ 9; Affidavit of Lolita Keaton, 10/24/00, at ¶ 9; Affidavit of Alberta Horton, 12/5/00, at ¶ 5; Affidavit of Kimberly Anderson, 10/24/00, at ¶ 7. Keaton claims trial counsel erroneously believed if he presented such evidence, the Commonwealth would be permitted to impeach these character witnesses with evidence of other outstanding rape charges against Keaton. Keaton also claims appellate counsel was ineffective for failing to raise this claim on direct appeal, under the mistaken belief that, at that time, such extra-record claims could be postponed until collateral review.[15]

Initially, we note the PCRA court denied relief on this issue because it concluded the absence of character evidence was not crucial in Keaton's case. We disagree; as discussed *infra*, there was no physical evidence directly linking Keaton to the crimes. Although blood and sperm were found on certain objects at the crime scene, it was only the testimony of one of the rape victims that connected these items to Keaton. Since Keaton admitted to having sex with the murder victim, but argued it was consensual, only the Commonwealth's expert's testimony rebutted Keaton's claim. Thus, credibility was important at Keaton's trial, and character evidence would have aided Keaton's case. *See Commonwealth v. Morgan*, 559 Pa. 248, 739 A.2d 1033, 1037 (1999) (citations omitted) ("It is well established that character evidence alone may be sufficient to raise a reasonable doubt and thus justify an acquittal of the charges."). Therefore, we do not find the PCRA court's conclusion to be supported by the record; however, we may affirm on other grounds. *See Commonwealth v. Shaw*, 494 Pa. 364, 431 A.2d 897, 899 n. 1 (1981) (Supreme Court may affirm trial court's decision if result is correct on any ground,

15. Again, in light of our conclusion that appellate counsel's failure to pursue extra-record claims was reasonable, we will review the underlying claim as a claim of trial counsel's ineffectiveness. *See* n. 11, 13, *supra*.

without regard to grounds which trial court itself relied upon). Accordingly, we turn to address Keaton's claim regarding trial counsel.

Keaton argues the law does not permit impeachment of a character witness with specific allegations of criminal conduct not resulting in convictions; as Keaton had no prior conviction record, trial counsel need not have feared cross-examination of character witnesses. Keaton relies on *Commonwealth v. Scott*, 496 Pa. 188, 436 A.2d 607 (1981), which held character witnesses could not be cross-examined about the defendant's prior arrests which had not led to convictions. We reasoned that since an arrest is equally consistent with either guilt or innocence, it "do[es] not carry the conclusive determination of guilt by conviction[,]" *Morgan*, at 1035 (citing *Scott*, at 612), and is thus unduly prejudicial if used as impeachment evidence. *Scott*, at 611–12. *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), clarified *Scott*, noting although a character witness could not be cross-examined regarding whether he knew of the defendant's arrests for misconduct related to the character trait the witness vouched for, the witness could be cross-examined about his knowledge of particular acts of misconduct not involving arrests. *Peterkin*, at 382–83, 383 n. 13. *Morgan* subsequently held character witnesses could not be cross-examined about prior criminal misconduct which had not resulted in arrest; we reasoned it would be illogical to preclude questioning about prior arrests not resulting in conviction but permit questioning about conduct which had not even led to an arrest. *Morgan*, at 1036; *see* Pa.R.E. 405(a) (reputation witness may be cross-examined regarding specific instances of conduct probative of character trait in question, but not regarding allegations of other criminal misconduct not resulting in conviction).

■■■■ As *Morgan* was decided after Keaton's trial, it is inapplicable; the adequacy of trial counsel's representation must be assessed in light of the standards in effect at the time it was provided. *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 789, 178 L.Ed.2d 624 (2011); *Bobby v. Van Hook*, 558 U.S. 4, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009); *Common-*

*wealth v. Smith,* 606 Pa. 127, 995 A.2d 1143, 1171 (2010). At the time of Keaton's trial, conduct for which he was arrested but not convicted was not admissible to impeach character witnesses, yet prior criminal misconduct not resulting in arrest was arguably a permissible line of inquiry under *Peterkin.* Although the "outstanding rape cases" trial counsel referred to presumably involved arrests and were thus inadmissible to impeach character witnesses under *Scott,* we find Keaton suffered no prejudice from trial counsel's failure to call character witnesses. Four of these proposed witnesses testified at the penalty phase. Reviewing their penalty phase testimony and their affidavits, we conclude any testimony they could have offered at the guilt phase would not have been helpful; their penalty phase testimony indicated they did not have frequent contact with Keaton, and his behavior was negatively impacted by his drug use. N.T. Sentencing, 9/22/94, at 25, 30, 33–35, 37–40. Thus, such testimony indicated not only that the family had lost touch with Keaton at the time of the offenses, but also that he acted out of character when he was under the influence of drugs, which was frequently. Furthermore, these witnesses' affidavits did not aver they were aware of Keaton's reputation in the community for peacefulness and non-violence, but only that their opinion was he was such a person.[16] *See* Affidavit of Lolita Keaton, 10/24/00, at ¶ 8; Affidavit of Denise Keaton, 10/24/00, at ¶ 8. "[C]haracter evidence is not the opinion of one person or even a handful of persons, but must represent the consensus of the community." *Commonwealth v. Blount,* 538 Pa. 156, 647 A.2d 199, 206 (1994) (citations omitted). The same is true of the affidavit from the character witness who did not testify at the penalty phase. Thus, we cannot conclude the outcome of the trial would have differed, had trial counsel called these wit-

16. Although Keaton's aunt's affidavit refers to his community reputation for peacefulness, it only pertains to his childhood, before he started using drugs; thus, there is no reference to Keaton's reputation for the character trait at issue around the time of the instant offenses. *See* Affidavit of Alberta Horton, 12/5/00, at ¶¶ 3, 4. The same is true of the affidavit of the family friend; her reference to Keaton's peaceful reputation pertains to their childhood together. *See* Affidavit of Kimberly Anderson, 10/24/00, at ¶ 2.

nesses. As Keaton's claim of trial counsel's ineffectiveness fails, he is not entitled to relief.

Keaton argues the prosecutor engaged in misconduct during the guilt phase opening and closing statements, and direct examination of the two rape victims. He claims trial counsel was ineffective for failing to object or request curative instructions, and appellate counsel was ineffective for failing to raise the issue on direct appeal.

> Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. Moreover, the prosecution and the defense alike are afforded wide latitude and may employ oratorical flair in arguing to the jury. The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that may be drawn from the evidence. Finally, any allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel. If a challenged remark is made in response to the defense's closing argument, it will generally be deemed fair response and hence permissible comment.

*Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 110 (1998) (citations omitted); *Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 801 (2004).

Keaton claims the prosecutor improperly injected inadmissible victim impact evidence during opening statements by making the following statement concerning one of the rape victims:

> You are going to hear that on June 1st of 1992, Michelle B[.] *was married, had four children and was separated from her husband.* She had been using crack cocaine and she was not living at home with her husband because of her addiction. You will see that *she has since that time cleaned up her act, so-to-speak, and she is at home with her husband,*

*with her children and she is no longer using drugs.* But at that time she was.

N.T. Trial, 9/13/94, at 23 (emphasis added). Keaton also claims the prosecutor continued this improper theme of portraying the victims as mothers and wives by eliciting testimony that Michelle B. was married and had children, and asking whether Nadine S. was married; trial counsel objected to these questions, but did not seek curative instructions after the trial court sustained the objections. *See id.,* at 34; N.T. Trial, 9/19/94, at 5. Keaton also cites the following comment the prosecutor made during the guilt phase closing, concerning the two rape victims:

You certainly saw that Michelle B[.] and Nadine S[.] are no longer on crack.... You saw how they looked today and you saw that they did not look like someone who was presently using and I believe you heard testimony from Michelle B[.] that she was back with her husband and children and that she was not using.

N.T. Trial, 9/20/94, at 54.

Keaton argues these comments elicited sympathy for the victims because they had undergone rehabilitation and one of them was married with children. The PCRA court held the comments were fair response to the defense's argument that both victims were unreliable witnesses because they were crack addicts, PCRA Court Opinion, 9/11/03, at 12; however, Keaton points out some of the comments were made during opening statement, before the defense made any attack on credibility.

 Contrary to Keaton's claim, the prosecutor's questions and statements about the victims' family lives were not victim impact evidence. Victim impact evidence is "information concerning the victim and the impact that the death of the victim has had on the family of the victim...." 42 Pa.C.S. § 9711(a)(2). Such evidence "is designed to show each victim's uniqueness as an individual human being." *Commonwealth v. McNeil,* 545 Pa. 42, 679 A.2d 1253, 1259 n. 11 (1996) (internal quotation omitted). Here, the prosecutor did not

attempt to generate sympathy for the victims and their families, but rather tried to mitigate any impact the victims' past drug use would have on their credibility; properly anticipating that trial counsel would use this fact to attack credibility, the prosecutor touched on the victims' rehabilitation in her opening statement. Any reference to the victims' being "back home with their families" was aimed at showing they were upstanding, reliable witnesses, not crack-abusing addicts. Furthermore, the trial court instructed the jury that counsels' questions and arguments were not evidence, N.T. Trial, 9/13/94, at 17–18, 21; N.T. Trial, 9/20/94, at 81–82, 118–19, and the jury is presumed to follow the trial court's instructions. *Commonwealth v. Minerd*, 562 Pa. 46, 753 A.2d 225, 232 (2000); *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 639–40 (1995) (prosecutor's inadvertent misstatement of fact during closing argument would not constitute basis for new trial where any prejudicial effect was cured by instruction telling jury attorneys' arguments are not evidence and jury is sole fact-finder).

■■■ Keaton contends the prosecutor made inflammatory, vindictive remarks during the guilt phase closing, to which trial counsel should have objected:

Ladies and Gentlemen, the kind of torture that that young woman went through should not happen to anybody.... Not only did these sexual assaults take place, but you recall her wallet was also taken containing $3.00. It wasn't enough to torture her like that, the defendant also took her money.

N.T. Trial, 9/20/94, at 60. The prosecutor later stated, "Ladies and Gentlemen, animals don't treat each other the way this defendant treated these young women." *Id.*, at 72. Trial counsel's objection was sustained, but he did not request a curative instruction.

Given that the evidence indicated Keaton not only raped one of the victims, but also stuck a tree branch and wine bottle up her vagina, urinated in her mouth, and beat her with a weightlifter's belt, the prosecutor's first remark was fair com-

ment on the evidence. Regarding the reference to "animals," we determined on direct appeal that "the remark itself was not manifestly inappropriate[,]" *Keaton,* at 540, and did not impair the jury from rendering a fair verdict. *Id.*

Keaton claims the prosecutor, during the guilt phase closing, injected expressions of personal opinion about the existence of a woman, "Topaz," who Keaton contended shared drugs and engaged in sex with him and the murder victim on the night of the crime:

> But I submit to you, Ladies and Gentlemen, that Topaz was a figment of the defendant's imagination. That he made up Topaz along with the story of how Sherrill Ann Hall was killed, so that it would not appear as though it was an intentional killing. Nobody has been able to locate anybody named Topaz in that area. Nobody knows Topaz. If in fact there were anybody named Topaz, wouldn't she have been brought in here by somebody? But nobody can locate anybody by that name. So I submit to you that you should not pay any attention to Topaz. . . .

N.T. Trial, 9/20/94, at 60–61. Keaton also claims the prosecutor expressed personal opinion regarding what degree of murder he had committed:

> When it comes to the Homicide Bill . . ., you will have five, or six, actually, possible verdicts. If you start with murder in the first degree, I think you will have no trouble following that Bill. I think you will find that in fact the Commonwealth has proven through the defendant's statement and through the physical evidence and the pattern of incidents, that in fact this was a premeditated, willful and deliberate killing. . . . *So if you start with murder in the first degree, I don't think you will have to go any further.*

*Id.,* at 70 (emphasis added).

In context, the prosecutor's statements were simply argument that the jury could infer the nonexistence of "Topaz" and the evidence established the elements of first degree murder; use of the word "think" does not automatically equate to an expression of personal opinion.

■ Keaton claims the prosecutor made comments during the guilt phase closing which had no support in the record and were designed to inflame the jury by portraying him in a negative light:

You heard about the fact that there were no shoes, no socks and no stockings in that property. Somebody, *and I submit to you the defendant, took those items out of that property.* There was no wallet, no pocketbook, no keys, no money, no means of identification except a medical card that had been somewhere near the body, apparently had fallen from something.

*Id.*, at 64 (emphasis added). Keaton argues there was nothing in the evidence to suggest he took the murder victim's shoes, socks, and personal items from the crime scene; the prosecutor suggested, with no basis, that he was not only a rapist and murderer, but also a robber.

Whether Keaton took these items from the victim was not at issue, and the prosecutor's brief remark could not have prejudiced the jury to the degree it was incapable of rendering a fair verdict. All of Keaton's prosecutorial misconduct claims fail; therefore, trial counsel cannot be deemed ineffective, and remand for further development of the claim pertaining to appellate counsel is unwarranted. *Walker*, at 9; *McGill*, at 1023.

■ Keaton claims appellate counsel was ineffective for failing to argue the trial court erred in limiting trial counsel's closing argument. During closing, trial counsel started to argue that because there was no DNA evidence linking Keaton to the crimes, the Commonwealth had not met its burden of proof. At side-bar, the trial court ruled that because no DNA testing had been conducted, DNA evidence was not part of the case. The trial court permitted trial counsel to argue the lack of physical evidence linking Keaton to the crimes, but not to specifically refer to the lack of DNA evidence. N.T. Trial, 9/20/94, at 26–28.

■ During closing argument, counsel may refer to all facts properly in evidence and argue all reasonable inferences

therefrom. *Abu–Jamal*, at 110 (prosecution and defense are afforded wide latitude in arguing to jury, but arguments must be based on matters in evidence and legitimate inferences drawn therefrom). Because there were no DNA test results in evidence, the trial court properly ruled trial counsel could not specifically mention DNA evidence, or the lack of it. Furthermore, Keaton cannot demonstrate he was prejudiced, where trial counsel was permitted to extensively argue the absence of any scientific evidence linking Keaton to the blood, semen, and fingerprints recovered from the crime scenes. N.T. Trial, 9/20/94, at 28–29, 32–33, 46–47.[17] As Keaton's record-based claim is meritless, there is no need to remand for further development of his claim pertaining to appellate counsel. *Walker*, at 9; *McGill*, at 1023.

Keaton claims the trial court failed to provide proper cautionary instructions regarding the consolidation of the three separate charges for trial; he alleges trial counsel should have requested an instruction limiting the purpose for which the jury could consider the evidence of the two rapes, and contends this evidence depicted him as a violent sexual predator, thus bolstering "an otherwise weak homicide case." Keaton's Brief, at 34. He further argues appellate counsel was ineffective for failing to raise this claim.

A jury charge must be read as a whole to determine whether it is appropriate, and the trial court has broad discretion in phrasing its instructions as long as the law is clearly, adequately, and accurately presented to the jury. *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 604 (2000) (citation omitted). Here, the trial court initially charged the

---

17. On direct appeal, in addressing Keaton's claim that the prosecutor's mention of the crime lab's absence at the rape scenes violated the trial court's ruling concerning the mention of DNA evidence, we noted:

[W]hile precluding arguments based on DNA evidence because such evidence had not been presented, the court ruled that defense counsel could argue the absence of scientific evidence linking Keaton to any of the blood and semen samples that the police gathered from the victims' garments and other physical objects. Immediately after this ruling, defense counsel proceeded to highlight the fact that the police did not produce any such scientific or other evidence.

*Keaton*, at 539.

jury it was to view the evidence regarding each crime sepa-
rately, as if each one were a separate trial, N.T. Trial, 9/20/94,
at 81; however, the prosecutor objected on the grounds this
charge required the jury to ignore the crimes' similarities
when they were consolidated for trial because such similarities
were evidence of a common scheme or plan. *Id.*, at 124–29;
*Keaton*, at 537–38. Accordingly, the trial court gave the
following supplemental instruction:

> I told you that you are to decide these cases separately with
> no pattern. You may use whatever inferences that you
> think are appropriate in considering all other evidence in
> making your decision on any other of the victims that is not
> included in that particular decision. You can carry over
> inferences in each case and consider with the evidence in
> that case whether or not the Commonwealth has met its
> burden.

N.T. Trial, 9/20/94, at 134–35. This instruction was not an
abuse of discretion; the trial court told the jury, consistent
with the purpose for which the cases were consolidated for
trial, that it could draw reasonable inferences based on the
crimes' similarities. Furthermore, the trial court told the jury
its verdict could not be based upon sympathy or prejudice
against Keaton or any of the victims, *id.*, at 82, and it could
not find Keaton guilty based on mere suspicion. *Id.*, at 84.
Finally, although case law and the Pennsylvania Suggested
Standard Jury Instructions provide a limiting instruction must
be given when evidence of an uncharged offense is admitted
under the common scheme or plan exception, *see* Pa.S.S.J.I.
(Crim.) 3.08; *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d
835 (1989), no similar requirement exists regarding other
charges consolidated in a single trial. As Keaton's record-
based claim is meritless, remand for further development of
his claim regarding appellate counsel's performance is unwar-
ranted. *Walker*, at 9; *McGill*, at 1023.

### *Atkins* Claim

As none of Keaton's guilt phase claims entitle him to relief,
we now turn to his claim that he is mentally retarded and thus

is not subject to the death penalty. *See Atkins, supra* (holding execution of mentally retarded criminals violates Eighth Amendment).[18] If Keaton prevails on this claim, the award of a new penalty phase must be reversed, and he must instead be sentenced to life imprisonment.

On remand, the PCRA court heard argument from the parties based on the record from Keaton's 2002 PCRA hearing,[19] at which he presented expert testimony, as well as testimony from family and friends. The Commonwealth also presented expert testimony.

■■■ To obtain relief on an *Atkins* claim, the defendant must show, by a preponderance of the evidence, that he is mentally retarded under either of the definitions of mental retardation provided by the American Psychiatric Association

18. Although *Atkins* was decided after Keaton's trial and sentencing, this Court held because *Atkins* announced a new rule of law prohibiting a certain category of punishment for a class of defendants because of their status, it fell under an exception to the general rule of nonretroactivity. *See Miller*, at 629 n. 5 (citing *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)).

19. In *Miller*, the PCRA court granted relief on an *Atkins* claim raised in a second petition; the court did not hold an evidentiary hearing, reasoning the documentary evidence, penalty phase evidence, and evidence from the first PCRA hearing established the petitioner's mental retardation by a preponderance of the evidence. This Court vacated and remanded for further proceedings, *Miller*, at 633; we concluded the testimony about mental retardation at the first PCRA hearing occurred in the context of the petitioner's attempt to establish his organic brain damage, rather than mental retardation. *Id.*, at 632–33. Accordingly, we remanded for an evidentiary hearing specifically to address the mental retardation issue.

Here, the evidence at Keaton's first PCRA hearing specifically addressed the issue of mental retardation; therefore, the PCRA court and parties stipulated there was sufficient evidence for the PCRA court to make findings on remand regarding whether Keaton was mentally retarded, without hearing additional evidence. *See* PCRA Court Opinion, 11/13/09, at 2. Remand was necessary not because of the lack of evidence, but because there was no specific ruling by the PCRA court on the issue, and the expert testimony from the first PCRA hearing was equivocal; some experts deemed Keaton borderline mentally retarded, while others concluded he was mildly mentally retarded. As *Miller* noted, the critical difference between these two states—"borderline mentally retarded" does not automatically equate with "mentally retarded" unless there are also significant deficits in adaptive behavior— necessitated remand for a conclusive ruling. *Id.*, at 632–33.

(APA) and the American Association of Mental Retardation (AAMR).[20] *Miller*, at 626–27.[21] In *Miller*, we stated:

> The AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." Mental Retardation[: Definition, Classifications, and Systems of Supports 1 (10th ed.2002),] at 1. The American Psychiatric Association defines mental retardation as "significantly sub-average intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." [Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) (DSM–IV),] at 37. Thus, ... both definitions of mental retardation incorporate three concepts: *1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset.*[22]

*Miller*, at 629–30 (footnote in original) (emphasis added); *see Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612, 614–15 (2007) (reaffirming *Miller's* standard).

 Regarding the requirement of limited intellectual functioning, there is no "cut-off IQ" for mental retardation; rather, it is the "interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental

**20.** As of January 1, 2007, the AAMR has been known as the American Association on Intellectual and Developmental Disabilities.

**21.** *Atkins* left it to each state to set standards and procedures for adjudicating the mental retardation of a defendant in a capital case; however, at the time *Miller* was decided three years later, bills had been introduced in Pennsylvania, but no legislation had been passed. *See Miller*, at 633 (Eakin, J., concurring); *see also Miller*, at 633 n. 11. To date, legislation concerning this subject has still not been passed, and cases continue to "languish and courts await action which has not been forthcoming." *Id.*, at 633 (Eakin, J., concurring).

**22.** The primary distinction between these two classification systems is that the DSM–IV specifies severity levels of mental retardation, whereas the AAMR classification system no longer specifies levels of severity, but instead, recognizes that a diagnosis of mental retardation relies on both limitations in IQ and adaptive skills and focuses on the levels of support needed following an individual diagnosis. *See* DSM–IV[,] at 45; AAMR[,] at 26.

retardation." *Crawley,* at 615 (quoting *Miller,* at 631). The PCRA court noted Keaton had his IQ measured by two experts who evaluated him for the PCRA hearing: Dr. Edward Dougherty, an expert in forensic psychology and mental retardation, and Dr. Jonathan Mack, a neuropsychologist. Dr. Dougherty concluded Keaton's IQ was 69, N.T. PCRA Hearing, 10/11/02, at 9–10, and administered standardized tests which revealed Keaton's reading, spelling, and mathematic abilities were at grade school levels, *id.,* at 10–11; Keaton also demonstrated deficits in his ability to express himself, functioning at the level of a 14–year–old. *Id.,* at 12. Dr. Mack found Keaton's IQ to be 80, N.T. PCRA Hearing, 11/1/02, at 11, 15; he concluded Keaton was not mentally retarded, but did find evidence of borderline intellectual function and brain damage. N.T. PCRA Hearing, 11/5/02, at 56–57.

The Commonwealth's expert, Dr. John O'Brien, a psychiatrist who evaluated Keaton for the PCRA hearing, did not administer any intelligence tests to Keaton, but accepted Dr. Mack's test results. N.T. PCRA Hearing, 11/2/02, at 18. He concluded Keaton was in the borderline to low-average range of intelligence, but did not believe Keaton to be mentally retarded. *Id.,* at 25–26, 36. Dr. Alan Tepper, a forensic psychologist who evaluated Keaton before trial, did not administer an IQ test, but based on other more limited tests of Keaton's cognitive functions, did not find Keaton to be mentally retarded. N.T. PCRA Hearing, 11/5/02, at 96.

The PCRA court noted the "substantially varying results" in the experts' evaluations of Keaton's intelligence, PCRA Court Opinion, 11/13/09, at 8, and gave more weight to the opinions and test results of Drs. Dougherty and Mack because they administered actual comprehensive IQ tests. *Id.,* at 9–10. The court gave weight to Dr. Dougherty's opinion because he was an expert in diagnosing mental retardation, *id.,* at 9 (citing N.T. PCRA Hearing, 10/11/02, at 3–4); however, it also gave Dr. Mack's opinion weight because he administered an adult IQ test as opposed to Dr. Dougherty's child-oriented, academic test. *Id.* (citing N.T. PCRA Hearing, 11/1/02, at 6, 10). The court noted Dr. Dougherty's finding an IQ score of

69 supported a finding of mild mental retardation,[23] and Dr. Mack's finding an IQ score of 80 conversely supported a finding of borderline to low-average intelligence; the court did not deem one score more valid than the other. *Id.*, at 10. Acknowledging that under *Crawley*, an IQ score must at least fall within the mentally retarded range, *see Crawley*, at 616, the court noted Keaton's scores were not high enough to automatically preclude a finding of mental retardation. PCRA Court Opinion, 11/13/09, at 10. Accordingly, it concluded "the results ... support the conclusion Keaton has borderline intellectual functioning compatible with a finding of mild mental retardation, and thus he has satisfied his burden of proof regarding limited intellectual functioning." *Id.*

Turning to the requirement that the onset of the symptoms of limited intellectual functioning be prior to the age of 18,[24] the PCRA court noted although no IQ tests were performed on Keaton prior to that age, other standardized tests showed he exhibited academic deficiencies at an early age. *Id.*, at 11 (citing N.T. PCRA Hearing, 10/11/02, at 103–04; N.T. PCRA Hearing, 11/5/02, at 31). The court credited the testimony of Drs. Dougherty and Mack, who opined Keaton's low test scores in first and third grade were evidence of limited intellectual functioning; they further opined this limited functioning was not solely the result of Keaton's many absences and later drug use. *Id.*, at 11–12. The court noted although Keaton demonstrated ability to perform at an average or better level in some of his studies, "the existence of certain areas of functioning does not necessarily rule out the presence of mental retardation." *Id.*, at 12 (citing N.T. PCRA Hearing, 10/11/02, at 54). Accordingly, the court concluded Keaton satisfied his burden of proof regarding the age of onset.

23. On cross-examination, Dr. Dougherty explained Keaton falls in the "intermittent mental retardation area because it is a fluctuating area," N.T. PCRA Hearing, 10/11/02, at 93, classifying him as "borderline retarded," "mildly retarded," and "on the borderline range of mild mental retardation." *Id.*, at 95–97.

24. *See Miller*, at 630 n. 7; *see also Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1183 (2009).

Finally, the PCRA court evaluated the evidence concerning significant limitations in adaptive functioning, the third element in the definition of mental retardation adopted in *Miller*. The AAMR lists the following as adaptive skills: language and money concepts (conceptual), responsibility and ability to follow rules (social), and meal preparation and money management (practical). *Miller*, at 630 n. 8. The AAMR recommends such limitations be shown by standardized testing; significant limitations are defined as performance that is at least two standard deviations below the mean of either (a) one of the three types of conceptual, social, or practical adaptive behavior, or (b) an overall score on a standardized measure of conceptual, social, and practical skills. *Id.*, at 630–31. The DSM–IV requires significant limitations in at least two of the following skills: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.*, at 630 n. 8.

Dr. Dougherty stated in his affidavit that his diagnosis of mild mental retardation was based on Keaton's IQ score of 69, as well as Keaton's demonstration of impairment in communication, functional academic skills, social skills, work skills, and self-direction skills. PCRA Court Opinion, 11/13/09, at 13. However, the court noted Dr. Dougherty did not perform standardized testing of Keaton's adaptive skills; therefore, it analyzed the record for evidence regarding significant limitation in at least two of the aforementioned areas of functional skills. *Id.* (citing N.T. PCRA Hearing, 11/2/02, at 19).

The court noted Drs. Mack and O'Brien corroborated some of Dr. Dougherty's testimony regarding Keaton's limited academic abilities in math and spelling not being related to his numerous absences. *Id.*, at 14 (citing N.T. PCRA Hearing, 11/5/02, at 31–32; N.T. PCRA Hearing, 11/2/02, at 37–38). Drs. Tepper and O'Brien noted Keaton was previously diagnosed with antisocial personality disorder. *Id.*, at 14–15 (citing N.T. PCRA Hearing, 11/5/02, at 88; N.T. PCRA Hearing, 11/2/02, at 15). Dr. Dougherty disagreed with these findings. *Id.*, at 15 (citing N.T. PCRA Hearing, 10/11/02, at 132). Dr.

Dougherty stated Keaton could only function under supervision, *id.* (citing N.T. PCRA Hearing, 10/11/02, at 88); however, Alberta Horton, Keaton's aunt, testified Keaton helped take care of her children, *id.* (citing Affidavit of Alberta Horton, 12/5/00, at ¶ 2), and both of his sisters testified that at age 10, Keaton began caring for them when their mother was ill, making sure they ate, washed their clothes, and went to school. *Id.* (citing N.T. PCRA Hearing, 10/2/02, at 45, 47–48; N.T. PCRA Hearing, 10/11/02, at 156–57). One of Keaton's sisters testified Keaton worked when he was older, as a mechanic and at a rug company; he was also able to drive.[25] *Id.* (citing N.T. PCRA Hearing, 10/11/02, at 158, 160).

Based on the above testimony, the PCRA court concluded Keaton failed to demonstrate limited adaptive functioning in more than one area. *Id.,* at 16–18. Although he showed his academic limitations in reading and math were potentially the result of mental retardation, his other academic disabilities were equally explainable by his numerous absences. *Id.,* at 16. The court further concluded the record did not support Dr. Dougherty's opinion that Keaton is significantly deficient in his social and interpersonal skills, communication, self-direction, or work. *Id.* Specifically, the court stated Dr. Dougherty's testimony that Keaton did not have an antisocial personality disorder undermined the expert's opinion that Keaton significantly lacked social skills. *Id.,* at 17. The non-expert testimony of Keaton's family and friends also contradicted this opinion, as well as the opinion that Keaton could only function under supervision. *Id.* The PCRA court found little to no evidence of any significant limitation of any other adaptive life skills. *Id.* Accordingly, the PCRA court concluded Keaton had demonstrated, at most, limited functional academic skills; as no other areas of significant limitation were apparent from the record, Keaton failed to establish the third element in the definition of mental retardation.

**25.** Dr. Dougherty testified Keaton's ability to perform tasks such as caring for his younger siblings and intermittently holding jobs was not inconsistent with mental retardation; Keaton could perform simple tasks with supervision. N.T. PCRA Hearing, 10/11/02, at 83–88.

We find the record supports this conclusion. Although Keaton's intelligence scores and age of onset may meet the two of the definition's elements, the record does not reveal significant limitation in his functioning in any other areas beyond academic; thus, the third element is not established. The PCRA court, as the arbiter of credibility, evaluated the testimony of Dr. Dougherty, the sole expert who concluded Keaton was mentally retarded, and gave his testimony appropriate weight as an expert in mental retardation. This testimony was outweighed, however, by the testimony of other credible experts and by those who interacted with Keaton on a daily basis and knew his abilities, particularly those related to adaptive life skills. Accordingly, we hold the PCRA court did not err in concluding Keaton failed to demonstrate he was mentally retarded so as to preclude the Commonwealth from seeking the death penalty. As Keaton is subject to the death penalty, we now turn to the parties' penalty phase claims.

**Penalty Phase**

Keaton raises several penalty phase claims,[26] and the Commonwealth, in its cross-appeal, raises one penalty phase claim: whether the PCRA court erred in granting a new penalty phase based on trial counsel's failure to investigate and present mitigating mental health evidence. As the Commonwealth's issue is dispositive, we address it first.

At the penalty phase, trial counsel presented testimony from Keaton's two younger sisters, his aunt, a family friend, and a minister who knew him from the neighborhood; against counsel's advice, Keaton also testified. All of the witnesses testified Keaton was helpful, respectful, and kind; he helped take care of his younger siblings when his mother was ill and took care of them after her death. Keaton's family members attested to his drug addiction and confirmed he was not himself when on drugs and did not associate with them when

**26.** Keaton claims: the prosecutor made improper arguments during the penalty phase; the trial court erred in its penalty phase instructions; the trial court failed to inform the jury that a life sentence means life without parole; the death sentence was the product of improper racial discrimination; and all prior counsel were ineffective for failing to raise these claims.

he was high. Keaton also admitted he had a drug problem and reiterated he did not commit rape or murder during his encounters with the victims. Counsel argued in closing that the jury should consider Keaton's age; he was young enough to have plenty of time to rehabilitate himself while serving a life sentence. Counsel also asked the jury to find Keaton was under the influence of extreme mental or emotional disturbance at the time of the offense because of his drug use. Finally, counsel asked the jury to consider the catch-all mitigator, arguing Keaton was a redeemable, decent person worth saving. *See generally* N.T. Sentencing, 11/22/94, at 17–57, 67–75.

At the PCRA hearing, Keaton's sisters testified their parents and their mother's boyfriends abused Keaton during childhood, and he also witnessed his mother and siblings being beaten. N.T. PCRA Hearing, 10/2/02, at 41–45, 54; N.T. PCRA Hearing, 10/11/02, at 154–55, 161. They again told how Keaton took care of his younger siblings when their mother became ill, resulting in his frequent absence from school. N.T. PCRA Hearing, 10/2/02, at 45–48; N.T. PCRA Hearing, 10/11/02, at 156–58. One sister mentioned their family lived in extreme poverty during Keaton's childhood. N.T. PCRA Hearing, 10/2/02, at 56. Both sisters testified Keaton was not violent, and had a good reputation as a peaceful, calm person. *Id.*, at 55; N.T. PCRA Hearing, 10/11/02, at 162. One sister characterized Keaton as having been normal until he became addicted to drugs. *Id.*, at 160. Both testified trial counsel did not prepare them for their testimony or inquire about Keaton's childhood; trial counsel only spoke to them outside the courtroom immediately prior to the penalty phase. N.T. PCRA Hearing, 10/2/02, at 54–55; N.T. PCRA Hearing, 10/11/02, at 161–62.

Keaton's aunt testified he was well-liked and respected in the community where he grew up, and was able to defend himself because of his size. *Id.*, at 86. A childhood friend of Keaton's testified he had a good reputation for being peaceful and non-violent. *Id.*, at 88. She further stated he was not bullied as a child, did not bully others, and was well-liked. *Id.*,

at 89. Affidavits from family members reiterated these details and averred they would have testified concerning them at the penalty phase, had trial counsel made them aware of the necessity. *See* Affidavit of Lolita Keaton, 10/24/00; Affidavit of Denise Keaton, 10/24/00; Affidavit of Alberta Horton, 12/5/00.

Dr. Knolly Hill, a psychologist who treated Keaton at age 13 in group therapy because of his academic difficulties, confirmed there was domestic violence in Keaton's family, but did not recall learning this fact from Keaton; he also could not recall whether Keaton was subjected to abuse himself, but knew he at least witnessed it happening to others. N.T. PCRA Hearing, 10/2/02, at 63, 68–71, 74. Dr. Hill confirmed Keaton was the family caretaker during his mother's illness, and opined his academic difficulties could be attributed to his resultant absences and not a lack of intelligence. *Id.*, at 75–76, 78–79. Dr. Hill observed Keaton was not aggressive, but that he was ostracized by the other children in the group because of his extreme poverty. *Id.*, at 66–67, 80–81.

Dr. Tepper, the forensic psychologist who evaluated Keaton for the guilt and penalty phases, testified Keaton told him about his siblings, his father's absence, his drug use, his adolescent counseling, his difficulty in school, and admitted he had temper control problems; Keaton did not mention he was physically abused. N.T. PCRA Hearing, 11/5/02, at 65–68, 87, 92–93. Dr. Tepper's screening test of Keaton revealed "a strong possibility of underlying organic or brain dysfunction." *Id.*, at 69. Dr. Tepper's preliminary findings after evaluating Keaton were that Keaton had: family/developmental problems as a child; perceptual motor difficulties which could be organically based and could interfere with his personal and social functions; and underlying feelings/impulses which he tried to control and used drugs to defend against. *Id.*, at 71–72, 87, 91, 93–95. Dr. Tepper stated, in light of these findings, he would have recommended trial counsel pursue further testing, and he reported his findings to trial counsel and asked for Keaton's records; his findings would have been "a basis to look into other records." *Id.*, at 72–73, 85–87, 90. However,

all the expert received from trial counsel was part of the police discovery materials. *Id.,* at 73.

Dr. Tepper testified he reviewed Keaton's records from school, adolescent counseling, juvenile dependency, and drug treatment. The school records revealed Keaton's poor attendance due to problems at home, and "really contain[ed] a large amount ... of ... personal and family information." *Id.,* at 74–75. Keaton's adolescent counseling records indicated he was abused or beaten in his neighborhood, had begun acting out, was the family caretaker, and lived in extreme poverty. *Id.,* at 84–85. The juvenile dependency records reflected Keaton's living conditions were "severe," which Dr. Tepper stated could affect development. *Id.,* at 78–80. The hospital records from Keaton's treatment for depression and suicidal ideations resulting from his drug addiction in 1988 contained his personal and family background, detailed his drug use and cocaine dependence, and indicated he suffered from auditory and visual hallucinations when he was on drugs. *Id.,* at 76–78. Dr. Tepper stated the hallucinations were significant because they suggested "some kind of brain involvement...." *Id.,* at 78. He also acknowledged the records contained a diagnosis of possible antisocial personality disorder, and reflected instances where Keaton was confrontational with other patients, particularly women, and had difficulty controlling his temper. *Id.,* at 87–88. Finally, Dr. Tepper reviewed Keaton's mother's mental health records, which contained information about Keaton's family background and the family's home life, adding to his developmental history. *Id.,* at 81–83.

Dr. Mack, the neuropsychologist who examined Keaton in preparation for his PCRA proceedings, testified his interview and testing of Keaton revealed Keaton was of borderline intelligence and had neurocognitive defects in executive functioning, which resulted in his having problems with inhibition, impulse control, planning, judgment, and adaptive behavior; these issues would be aggravated when he was under stress or the influence of drugs. N.T. PCRA Hearing, 11/1/02, at 7, 16–20, 24–25; N.T. PCRA Hearing, 11/5/02, at 37. The expert further concluded, based on his tests and his review of the

records and affidavits, Keaton had brain damage resulting from chronic poly-substance abuse, possible serial beatings to the head, and a gunshot wound to the head. N.T. PCRA Hearing, 11/1/02, at 21–24. Thus, the doctor disagreed with the 1988 hospital report's conclusion there was "no gross evidence of cognitive impairment." N.T. PCRA Hearing, 11/5/02, at 55–56. He further stated this brain damage was present at the time of the crime. *Id.*, at 37. Dr. Mack also noted Keaton underwent a personality change resulting from this brain injury and had a learning disorder; his poor academic performance was not solely attributable to his frequent absences, although his school records never classified him as learning disabled. *Id.*, at 31, 33, 37. The expert stated although nothing in Keaton's records indicated he was abused as a child, Keaton and the affidavits from his family supplied this information. *Id.*, at 33–35, 40, 49. Finally, Dr. Mack testified although Keaton appears to be "average" when spoken with, he is actually impaired in memory, problem-solving, processing speed, and attention; his verbal skills enable him to present himself as brighter and more cognitively intact than he actually is. N.T. PCRA Hearing, 11/1/02, at 8–9, 11–12; N.T. PCRA Hearing, 11/5/02, at 53. Dr. Mack's testimony supported Dr. Tepper's opinion that further testing would have been helpful in gathering information for the penalty phase.

Dr. Dougherty testified his assessment of Keaton, coupled with his review of the records and affidavits, indicated Keaton had some kind of neurological problem which interfered with his functioning ability. N.T. PCRA Hearing, 10/11/02, at 5–7, 13–14. Additionally, a short neurological assessment procedure the expert administered indicated neurological problems which warranted further evaluation; therefore, he recommended PCRA counsel obtain a comprehensive neurological examination for Keaton. *Id.*, at 19–21, 122. The personality tests Dr. Dougherty administered revealed Keaton was severely depressed, functioned at a low intellectual level, had experienced hallucinations, had long-existing substance abuse problems and attention deficit hyperactive disorder, and had

bipolar disorder characterized by episodes of grandiosity and mania. *Id.*, at 21–25, 27, 60–61. According to the expert, all of these issues interfered with Keaton's ability to think clearly and function effectively, particularly when he was under stress or the influence of drugs. *Id.*, at 61. Dr. Dougherty also noted Keaton's extensive drug use interfered with his cognitive function and could exacerbate his mood disorder. *Id.*, at 42–43.

Dr. Dougherty stated Keaton's hospital records demonstrated his long-existing depression and cocaine addiction, and detailed his displays of grandiosity, childlike behavior, and rambling, tangential speech—all indicators of bipolar disorder. *Id.*, at 28–35, 139. The hospital records also documented Keaton's suicide attempt and hallucinations. *Id.*, at 28, 34–36. The expert stated the hospital records were "very consistent" with his findings regarding Keaton's mental health. *Id.*, at 34–35.

Dr. Dougherty testified his review of Keaton's school records revealed Keaton missed up to one-third of each school year and was functioning at the fourth grade level in eleventh grade. His teachers' comments were indicative of attention deficit disorder, which went untreated. *Id.*, at 37–42. The expert stated the dependency petition filed for Keaton during childhood noted the "squalid" background of neglect and poverty Keaton experienced. *Id.*, at 44–45. The expert further noted affidavits from friends and family indicated Keaton saw others in his household being abused, that there was no structure in the house, and Keaton frequently did not know where he would be spending the night because of his mother's fights with her abusive paramours. *Id.*, at 46–50. The expert admitted none of Keaton's school and health records mentioned Keaton being physically abused; however, he indicated Keaton said in other documents that his mother hit him. *Id.*, at 46, 81–83. Dr. Dougherty testified his review of Keaton's mother's mental health records showed she was mentally ill, severely depressed, and could not care for herself or her children; Keaton was needy and did not get support at home or in school. *Id.*, at 50–51.

Finally, the expert testified he disagreed with the Commonwealth expert's conclusion Keaton did not experience mania and that he was in the borderline to low-average range of intelligence. *Id.,* at 57–59. He opined Keaton had "really fooled" the court-appointed psychologist who examined Keaton as part of a 1997 pre-sentence investigation (PSI) and found him to be of "superior intelligence"; he explained Keaton uses "very interesting language" and possesses superficial intelligence, which was pointed out in the hospital records. *Id.,* at 131–32. Dr. Dougherty also disagreed with the psychologist's diagnosis that Keaton had antisocial and paranoid personality disorder.[27] *Id.,* at 132.

Dr. O'Brien, the forensic psychologist, interviewed Keaton and reviewed the records and affidavits. N.T. PCRA Hearing, 11/2/02, at 6–9, 28. He noted Keaton's school records showed, despite his poor attendance, he managed to graduate in the middle of his class. *Id.,* at 9–10, 33–34, 39. The dependency petition showed Keaton's deplorable home conditions as a child, *id.,* at 10, 32, and Keaton stated in his interview that his mother's boyfriends abused him as well as his mother; however, none of the records indicated Keaton was physically abused. *Id.,* at 28–31, 62. Dr. O'Brien noted Keaton's hospital records indicated he had depression, suicidal ideations, and substance abuse, *id.,* at 10–11; however, he disagreed with the diagnosis of bipolar disorder, opining the same symptoms could have been attributable to Keaton's withdrawal from drugs, and adjustment disorder might have been a more appropriate diagnosis. *Id.,* at 45, 57–60. The expert also noted there was no documentation in the hospital records regarding any cognitive impairment, but there was also no indication that cognitive testing was performed there. *Id.,* at 12.

Dr. O'Brien noted Keaton's 1994 PSI indicated he had no cognitive impairments, his short- and long-term memory was intact, as was his abstract thinking, and he had a personality

27. The PCRA court took judicial notice of the fact the PSI's psychological interview lasted an hour or less. N.T. PCRA Hearing, 10/11/02, at 133.

disorder and substance abuse issues. *Id.*, at 14–15. Keaton's 1997 PSI indicated he had adjustment reaction, situational depression, and antisocial and paranoid personality disorders; however, he had no thought disorder or psychosis, and his intellectual functioning was intact. *Id.*, at 15–16. The expert observed the affidavits of Keaton's family and friends stated Keaton's substance abuse changed him; he had previously been the family caregiver and functioned well. *Id.*, at 20–21.

Dr. O'Brien disagreed with Dr. Dougherty's diagnosis of attention deficit disorder, *id.*, at 35–37; although he agreed with Dr. Mack's test results, he did not agree with Dr. Mack's conclusion they were indicative of a cognitive disorder. *Id.*, at 18, 55. Dr. O'Brien further stated his own cognitive capacity screening of Keaton revealed limited impairment, but not to the degree that he would refer him to a neuropsychologist; there was nothing clinically significant. *Id.*, at 51–54. Finally, Dr. O'Brien testified Keaton's depiction of the crime during their interview was the same as that given at trial and in Keaton's police statement. *Id.*, at 22. Based on this depiction, Keaton was aware of what was happening at the time of the crime; nothing indicated his behavior was influenced by cognitive impairment or substance intoxication to the point he did not know what he was doing. *Id.*, at 23–27. Thus, the expert's testimony contradicted the evidence offered regarding the (e)(2) and (e)(3) mitigators.

Trial counsel testified he retained an investigator and Dr. Tepper to prepare for the penalty phase; it was his practice to hire an expert for capital cases, and he did not retain Dr. Tepper due to any suspicion that Keaton had mental health issues. N.T. PCRA Hearing, 10/2/02, at 7, 14, 21. Trial counsel stated he would not have been looking for any mental health issues when the investigator met with Keaton, and his communications with Keaton never indicated there were mental health issues other than Keaton's intoxication on drugs at the time of the crime. *Id.*, at 15, 29. Trial counsel explained it was his practice to leave the mental health investigation up to the expert. *Id.*, at 29. Trial counsel testified he spoke to Keaton's family and girlfriend in preparation for the penalty

phase, but could not recall when he spoke to them prior to trial, or whether he asked them about Keaton's childhood, although that was his usual practice. *Id.,* at 7, 8, 11, 28. He did not recall any family members telling him about Keaton's drug abuse or role as the family caretaker. *Id.,* at 30. He did not recall Keaton saying anything about being abused as a child, and explained it was not his practice to ask a client about abuse. *Id.,* at 28–29.

Regarding what background information he provided to Dr. Tepper, trial counsel did not recall with specificity what he gave this expert, but testified it was his usual practice to provide the entire file of his discovery materials and notes from investigation. *Id.,* at 8. Although trial counsel testified he would probably have ordered Keaton's school records regardless of whether he suspected mental health issues, he did not remember subpoenaing or sending an investigator to obtain these records, or those from Keaton's hospitalization and adolescent counseling; he did not recall seeing such documents at the penalty phase. *Id.,* at 9, 10, 22–23, 35–36. Trial counsel did not remember what Dr. Tepper told him after having examined Keaton. *Id.,* at 36. Trial counsel denied that he would have left it up to the expert to obtain Keaton's pertinent records, explaining he believed it was ultimately his responsibility to ensure such records were procured. *Id.,* at 22, 37–38. Finally, trial counsel admitted he spent more time preparing for the guilt phase than the penalty phase because of the number of charges involved other than murder. *Id.,* at 11–12.

Trial counsel's affidavit, which was stipulated as evidence at the PCRA hearing, stated he did not recall the specifics of his preparation for Keaton's case, such as who he interviewed prior to trial, or whether he obtained Keaton's school and medical records. He averred although it was his general practice to hire a mental health expert, he could not recall whether he had Keaton evaluated by one, and if so, what the results were and why he did not call such witness at the penalty phase. *See* Affidavit of Thomas Moore, Esq., 9/8/02, at 1, ¶ 4.

As previously noted *supra*, appellate counsel testified he had one telephone conversation with Keaton, but did not obtain a life history. Nothing indicated to him that Keaton had mental health issues or had a childhood history of physical abuse. N.T. PCRA Hearing, 11/1/02, at 27–28; N.T. PCRA Hearing, 11/5/02, at 9–13. Appellate counsel stated in his affidavit that he lacked the resources to investigate extra-record issues, and he believed such issues were to be left for collateral review through the PCRA. Accordingly, he did not request funds for investigation of extra-record claims. See Affidavit of Bernard J. Siegel, Esq., 10/29/02, at 1–2, ¶¶ 3, 5–7.

After hearing all of the evidence, the PCRA court found "there was substantial information available at the time of trial that trial counsel should have investigated" that would have produced evidence in support of the § 9711(e)(2), (3), and (8) mitigators. PCRA Court Opinion, 9/11/03, at 22. The court held:

> Trial counsel's failure to develop and present this evidence was not a strategic decision. This "decision" was without any reasonable basis. Indeed, it was virtually without basis because counsel did no investigation despite that [sic] availability of social history information at the time of trial. There is a substantial likelihood that, had the mitigation evidence presented at the PCRA hearings been presented at trial, the outcome of the penalty hearing would have been different.

*Id.*, at 22–23. Accordingly, the PCRA court granted Keaton a new penalty hearing.

The Commonwealth argues the PCRA court erroneously granted relief on the waived claim of trial counsel's ineffectiveness without examining the sole issue preserved for collateral review: whether appellate counsel was ineffective. The Commonwealth further asserts the PCRA court's grant of relief amounts to a finding that appellate counsel was ineffective *per se* for not raising an arguably meritorious claim of trial counsel's ineffectiveness; this result ignores the "reasonableness" and "prejudice" prongs of the ineffectiveness test regarding appellate counsel and instead focuses solely on the

"nested" first prong of the test, which requires an examination of trial counsel's ineffectiveness. *See Rush,* at 656.

The Commonwealth asserts appellate counsel made a reasonable investigation of all record-based claims, arguing eight issues on direct appeal; this Court concluded one issue had merit, but found the error was harmless. *See Keaton,* at 542–45. Furthermore, the Commonwealth contends, the information available to appellate counsel gave him no reason to suspect Keaton had any mental health issues; thus, there was a reasonable basis for his focusing solely on record-based claims.[28] *See* Affidavit of Bernard L. Siegel, Esq., 10/29/02, at 1–2, ¶¶ 5–6.

The Commonwealth further contends, even if the issue of trial counsel's ineffectiveness is before this Court, the testimony from the PCRA hearing indicates trial counsel could not recall whether he obtained Keaton's school, hospital, and family court records. *See* N.T. PCRA Hearing, 10/2/02, at 8–10. The Commonwealth asserts trial counsel was probably aware of Keaton's hospitalization and counseling for drug abuse because Keaton told the expert counsel hired, *see* N.T. PCRA Hearing, 11/5/02, at 66–67, and counsel elicited penalty phase testimony from Keaton about his treatment for drug abuse. *See* N.T. Sentencing, 9/22/94, at 53–54. Thus, the Commonwealth contends, the record does not support the conclusion that trial counsel did not obtain Keaton's records. Even if trial counsel did not obtain the records, however, the Commonwealth argues the information they contained would not have provided helpful mitigation evidence; Keaton's school records refute his mental retardation claim, *see* PCRA Petition Exhibits, Tab 11, his family court records do not indicate he was physically abused as a child, *see id.,* Tab 10, and his hospital records indicate he had no gross cognitive deficits. *See id.,* Tab 12. The Commonwealth notes the hospital records contain diagnoses of depression, drug abuse, anti-social

---

**28.** The Commonwealth observes in *Grant,* decided subsequent to Keaton's direct appeal, we noted with approval the rationale that appellate counsel's role is limited to reviewing the record for claims of error, not uncovering extra-record claims, which are better left for collateral proceedings. *See Grant,* at 736–37.

personality disorder, and anger issues, as well as the notation Keaton displayed hostility towards other patients, especially women. *See* Commonwealth's Brief, at 31. The Commonwealth contends this information was more harmful than helpful to Keaton; it was trial counsel's strategy to portray Keaton as a decent individual worth saving, who had been a kind, reliable person until he became addicted to drugs. Allowing information about Keaton which made him appear unstable, or hostile and violent towards women, would not have been beneficial.

Additionally, the Commonwealth claims evaluations of Keaton in 1994 and 1997, both performed for PSI purposes, indicated he had no major mental illness, but rather had adjustment and personality disorders; in these evaluations, he reported no physical abuse as a child, did not allude to any dysfunction in his upbringing, and did not mention such topics to trial counsel or the expert who evaluated him for penalty phase mitigation. *See* Pre–Sentence Report, 5/1/97; Mental Health Evaluation, 4/14/97; Mental Health Evaluation, 10/28/94; Pre–Sentence Report, 10/17/94. The Commonwealth also notes PCRA counsel conceded none of the records available to trial counsel indicated Keaton was physically abused as a child. *See* N.T. PCRA Hearing, 11/5/02, at 35. Thus, the Commonwealth contends the information trial counsel had available at the time of trial through his use of an investigator and mental health expert, coupled with his own interactions with Keaton, *see* N.T. PCRA Hearing, 10/2/02, at 15–17, revealed no indication of the mental issues or abuse the PCRA court held counsel should have discovered.

Finally, the Commonwealth argues the PCRA court impermissibly employed a hindsight analysis, contrary to *Strickland* and *Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346 (1999).[29] It contends the PCRA court improperly read *Williams v. Taylor* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d

---

**29.** *Laird* noted, "[A]n attempt to retry the case with new tactics, buttressed by a hindsight evaluation of the record, will not support a claim of ineffectiveness." *Laird*, at 358 (quoting *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613, 618 (1991)).

389 (2000), and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), as dictating counsel be deemed ineffective *per se* if he failed to pursue every possible avenue regarding mitigating evidence. It further distinguishes *Williams* and *Wiggins* as cases where counsel conducted little or no investigation, whereas Keaton's trial counsel used court funds to hire an investigator and a psychologist, *see* N.T. PCRA Hearing, 10/2/02, at 7, 14; the psychologist hired, Dr. Tepper, was the expert "of choice" in capital cases. *See* N.T. PCRA Hearing, 11/5/02, at 64. Accordingly, the Commonwealth asserts the PCRA court's award of a new penalty phase was based on misapplication of case law, and on defense-obtained expert tests conducted 10 years after the crimes.

In *Williams* and *Wiggins,* the United States Supreme Court held capital counsel has an obligation to thoroughly investigate and prepare mental health and other mitigating evidence, *Williams,* at 396; counsel cannot meet this requirement by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins,* at 524, 123 S.Ct. 2527. In *Commonwealth v. Williams,* 597 Pa. 109, 950 A.2d 294 (2008), this Court noted:

> Under prevailing constitutional norms as explicated by the United States Supreme Court, capital counsel has an obligation to pursue all reasonable avenues for developing mitigating evidence. Counsel must conduct a thorough pretrial investigation, or make reasonable decisions rendering particular investigations unnecessary. Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, courts are to make all reasonable efforts to avoid distorting effects of hindsight. Nevertheless, courts must also avoid "*post hoc* rationalization of counsel's conduct."

*Id.,* at 303–04 (citations and footnote omitted).

In *Bobby,* the United States Supreme Court clarified what *Strickland* requires in the context of investigation and prepa-

ration of penalty phase mitigating evidence, noting that counsel's performance is to be evaluated in light of "the professional norms prevailing when the representation took place." *Bobby,* at 16 (citations omitted); *see Strickland,* at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Richter,* at 778 (question is whether attorney's representation "amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom"); *Smith,* at 1171 (holding *Williams* and *Wiggins* upheld well-settled *Strickland* ineffectiveness standard, applying it to later cases involving specific question of counsel's duty to investigate mitigating evidence in capital case; standard is general and must be flexible enough to take into account prevailing professional norms at time of counsel's performance).

■ We first turn to the Commonwealth's assertion that the PCRA court failed to address appellate counsel's performance, improperly focusing solely on the claim pertaining to trial counsel. The Commonwealth is correct that he PCRA court's decision to grant relief is based on trial counsel's deficient performance; it did not address the reasonableness of appellate counsel's strategic decision to forego presenting this arguably meritorious issue and only present record-based claims, or whether such decision prejudiced Keaton. However, in light of our conclusion that appellate counsel's decision to forego raising extra-record claims was reasonable, the PCRA court's lack of analysis regarding appellate counsel's performance does not change the result here; indeed, under *Walker,* the claim regarding appellate counsel is passed through and not treated as a layered claim, enabling the merits of the extra-record claim regarding trial counsel to be addressed. Thus, the Commonwealth's claims that the PCRA court erroneously granted relief on a waived claim and found appellate counsel ineffective *per se* fail, and we turn to review Keaton's claim regarding trial counsel's stewardship.

 Viewing the evidence from the PCRA hearing, as well as Keaton's school, dependency, hospital, and pre-sentence records, we agree with the PCRA court that trial counsel's investigation regarding penalty phase mitigating evidence fell below the standard expressed in *Williams* and *Wiggins*. *See Wiggins*, at 524, 123 S.Ct. 2527 (counsel cannot meet obligation by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources."). The only mitigating evidence trial counsel introduced pertained to Keaton's drug abuse, role as family caretaker, and peaceful nature. Trial counsel testified he did not suspect Keaton had any mental health issues, based on his limited interactions with him; however, as the court below found, had counsel reviewed Keaton's hospital and pre-sentence investigation records, he would have seen diagnoses which included not only drug dependency, but also depression, suicidal ideations, auditory and visual hallucinations,[30] and bipolar, antisocial, and paranoid personality disorders. The testimony of Drs. Mack and Dougherty indicated Keaton presented as being intellectually average; a layperson would not be able to detect any cognitive or mental health issues. Had trial counsel obtained Keaton's records, he would have seen numerous suggestions that Keaton had more issues than just drug abuse. Trial counsel admitted he hired Dr. Tepper to screen Keaton because it was his usual practice, not because he suspected any mental health issues; however, Dr. Tepper's examination revealed the possibility of brain dysfunction, such that he recommended further testing[31] and asked for Keaton's records. Trial counsel did not heed this advice and failed to provide the pertinent records. Although, as the Commonwealth points out, some of the records indicated no cognitive impairment

30. As Dr. Tepper noted, the hallucinations suggested "some kind of brain involvement." N.T. PCRA Hearing, 11/5/02, at 78. ´Dr. Dougherty's examination of Keaton corroborated that Keaton had experienced hallucinations. N.T. PCRA Hearing, 10/11/02, at 22.

31. Dr. Dougherty corroborated Dr. Tepper's opinion that further evaluation was warranted; Dr. Dougherty testified his brief neurological assessment of Keaton indicated there were possible problems calling for more testing. N.T. PCRA Hearing, 10/11/02, at 19–21, 122.

issues,[32] Dr. Tepper's conflicting assessment, coupled with the other diagnoses in the records, at least warranted further examination. While the other defense experts who opined Keaton suffered cognitive impairment conducted their evaluations 10 years after the crimes, Dr. Tepper's assessment was conducted at the time of trial, and trial counsel offered no reasonable basis for ignoring his own expert's advice, not providing him with the pertinent records, and not calling him as a witness. Trial counsel only offered that he was more focused on preparing for the guilt phase than the penalty phase. *See Smith*, at 1172–73 (holding trial counsel's failure to investigate mitigating mental health evidence despite suggestions he have defendant evaluated, coupled with counsel's myopic focus only on guilt phase, constituted ineffectiveness warranting new penalty phase).

Had trial counsel reviewed Keaton's adolescent counseling and dependency records [33] and asked Keaton and his siblings, he would have discovered available evidence concerning Keaton's childhood abuse and the deplorable poverty and neglect he was raised in; however, counsel testified it was not his practice to inquire regarding abuse. There was no other

**32.** While some of the notations in Keaton's records may have not been favorable to the defense, such as the hospital records' comments regarding Keaton's anger issues and "no gross evidence of cognitive impairment," N.T. PCRA Hearing, 11/5/02, at 55–56, 87–88, as well as the PSIs' indication of no cognitive impairment, there was no indication cognitive testing was performed at the hospital, N.T. PCRA Hearing, 11/2/02, at 12, and the PSIs were conducted very briefly by experts who were not neuropsychologists.

**33.** Keaton's academic records indicated possible undiagnosed attention deficit disorder and a learning disability, N.T. PCRA Hearing, 10/11/02, at 37–42; N.T. PCRA Hearing, 11/5/02, at 31, 33; however, these are not the serious types of mental diseases or defects which would have likely rendered a different outcome had they been made known to the jury. *See Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 697 (2009) (concluding expert psychological testimony that appellant suffered from attention deficit hyperactive disorder would not have led jury to conclude he suffered from serious mental health malady or affliction); *but see Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640, 656 (2008) (appellant's failure to pass several grades and placement in special class strongly suggested potential mental, cognitive, emotional, and social difficulties which would bear investigation as potential mitigating evidence).

documentation of abuse; therefore, obtaining a thorough, probing history from Keaton and his siblings was crucial.

The above evidence was not merely cumulative of that presented at the penalty phase; during that phase, the evidence presented pertained to Keaton's drug abuse and role as family caretaker, the theme being that he was a good person whose addiction was his downfall. The evidence trial counsel failed to investigate and present pertained to Keaton's dysfunctional upbringing and mental health issues. *Cf. Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125, 1152–54 (2009) (holding trial counsel not ineffective where penalty phase evidence did not materially differ from evidence trial counsel failed to investigate and provide to mental health expert; under such circumstances, not likely at least one juror would have accepted at least one mitigator and found it outweighed aggravator). The strategy of focusing on a defendant's redeeming qualities, rather than painting him as the deranged product of a horrific background, is often a reasonable one. *See Commonwealth v. Gibson*, 596 Pa. 1, 940 A.2d 323, 327 (2005) (Eakin, J., dissenting) (noting two types of mitigating evidence: focusing on defendant's positive traits in order to establish his redemptive qualities, and focusing on his negative background as explanation for why he committed crime); *Commonwealth v. Bridges*, 584 Pa. 589, 886 A.2d 1127, 1133 (2005) (unpleasant childhood factors counsel was aware of would have detracted from mitigation evidence trial counsel did present); *Commonwealth v. Robinson*, 583 Pa. 358, 877 A.2d 433, 448 (2005) (counsel used information from defendant and family to paint defendant in most positive light possible).

Here, however, trial counsel chose this strategy without further investigation or awareness of other available options. Evidence about a defendant's background and character is relevant because of the societal belief that defendants who commit crimes attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than those without such excuses. *See Perry*, at 319. Thus, trial counsel's decision not to investigate what was deemed a viable alternative by his expert, coupled with his failure to secure

records which would have shed further light on this option,[34] supports the finding that decision was not reasonable. Furthermore, because evidence of neurological impairment and psychological disorders would have supported the (e)(2), (3), and (8) mitigators, there is a reasonable probability at least one juror may have struck a different balance, had such evidence been presented. *See Smith,* at 1173 ("[W]e cannot say that, had such ... mitigating evidence been presented, the jury would still have arrived at a death verdict.") (citing *Wiggins,* at 537, 123 S.Ct. 2527). Accordingly, we agree with the PCRA court's conclusion[35] that trial counsel's failure to investigate and present mitigating mental health evidence at the penalty phase prejudiced Keaton; therefore, the award of a new penalty phase was proper. Having concluded the PCRA court did not err in ruling Keaton is entitled to a new

34. We are cognizant that trial counsel testified he did not recall which records he obtained prior to trial. N.T. PCRA Hearing, 10/2/02, at 8–10, 22–23, 35–36; Affidavit of Thomas Moore, Esq., 9/8/02, at 1, ¶ 4. Our conclusion that he did not provide the records at issue is not based on his lack of recall, but rather on Dr. Tepper's testimony that he asked counsel for Keaton's records and only received part of the police discovery materials, N.T. PCRA Hearing, 11/5/02, at 73, and trial counsel's admission that it was ultimately his responsibility to ensure the expert received the requested materials. N.T. PCRA Hearing, 10/2/02, at 22, 37–38.

35. Contrary to the Commonwealth's assertion, the PCRA court did not interpret *Williams* and *Wiggins* as requiring counsel be deemed ineffective *per se* for failing to investigate *every* possible option regarding mitigating evidence. The PCRA court noted *Williams* and *Wiggins* held counsel's obligation was *"to conduct a thorough investigation of the defendant's background* [,]" PCRA Court Opinion, 9/11/03, at 13–14 (citing *Williams,* at 396) (emphasis added), and to "discover *all reasonably available* mitigating evidence[.]" *Id.,* at 17 (quoting *Wiggins,* at 524, 123 S.Ct. 2527) (emphasis added). This is an accurate reading of these cases. Furthermore, the PCRA court did not employ a hindsight analysis, as the Commonwealth contends; rather, it evaluated trial counsel's conduct in light of the prevailing professional norms at the time of trial. *See Richter,* at 778; *Bobby,* at 16. Indeed, trial counsel admitted it was his usual practice to employ a mental health expert; he offered no reasonable explanation why he ignored this expert's advice and did not call him to testify. As noted in *Smith, Williams* and *Wiggins* did not create a new standard to be retroactively applied, but instead upheld *Strickland's* well-settled ineffectiveness standard, applying it to later cases involving capital counsel's duty to investigate mitigating evidence. *See Smith,* at 1171.

penalty phase, we need not address his penalty phase issues. *See Commonwealth v. Cuevas*, 574 Pa. 409, 832 A.2d 388, 396 n. 3 (2003) (citing *Commonwealth v. Merchant*, 528 Pa. 161, 595 A.2d 1135, 1139 (1991)) (where capital case is remanded for new penalty hearing, remaining penalty phase issues are rendered moot and need not be addressed).[36]

**PCRA Proceedings**

Keaton claims the PCRA court deprived him of due process when it denied his request for discovery. Keaton requested the police records in all cases in which he was interrogated at the same time he was interrogated regarding Hall's murder, as well as the police records in the rape case regarding Nadine S.; he claimed these records were relevant because the cases were "factually and procedurally intertwined" and his arrest for Nadine S.'s rape "started the chain of events which led to his subsequent interrogation and arrests." Amended PCRA Petition, 11/20/00, at 124, ¶ 331a. Keaton requested the police records in two other rape cases involving the same officer who investigated Michelle B.'s rape; he claimed these records were "relevant to analyze the credibility of this officer and his role in the investigation on this case." *Id.*, at ¶ 331b. Keaton also requested the notes of testimony on his pre-trial motion to dismiss counsel, alleging only that his right to counsel was violated by the trial court's summary denial of his subsequent motion for dismissal of counsel. *Id.*, at ¶ 331c. Finally, Keaton requested the medical records from Michelle B. and another rape victim; he claimed these records were "relevant to the petition and necessary to analyze the testimony of these witnesses." *Id.*, at 125, ¶ 331d.

We review the denial of discovery for an abuse of discretion. *Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d

---

**36.** Keaton also asserts he is entitled to relief because of the cumulative effect of all the alleged errors. We have recently "recognize[d] that if multiple instances of deficient [trial counsel] performance are found, the assessment of prejudice properly may be premised upon cumulation." *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009). However, apart from trial counsel's failure to present mitigating mental health evidence, we find the other errors cited by Keaton had no cumulative prejudicial effect. Accordingly, this claim fails.

237, 272 (2008) (citation omitted). "On the first counseled [PCRA] petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Pa.R.Crim.P. 902(E)(2). "A showing of good cause requires more than just a generic demand for potentially exculpatory evidence." *Collins*, at 272 (quoting *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 750 (2004)). A general assertion of necessity will not suffice to establish good cause. *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1175 (1999). " '[A]n evidentiary hearing ... is not ... a fishing expedition for any possible evidence that may support some speculative claim of ineffectiveness.' " *Commonwealth v. Wharton*, 571 Pa. 85, 811 A.2d 978, 989 n. 12 (2002) (quoting *Commonwealth v. Scott*, 561 Pa. 617, 752 A.2d 871, 877 n. 8 (2000)).

 We find the PCRA court did not abuse its discretion in denying Keaton's discovery request. His general assertion of relevance to suppression and credibility issues is insufficient to meet his burden of showing good cause. He "essentially requested wholesale discovery of" police and medical reports, as well as hearing transcripts, in order to "discern whether his assertions were true." *Williams*, at 1175 (quoting *Abu–Jamal*, at 91). Accordingly, Keaton's discovery claim fails.

Keaton contends the PCRA court abused its discretion in granting an evidentiary hearing only on his claim regarding trial counsel's failure to investigate and present adequate mitigating evidence during the penalty phase; he argues he is entitled to a hearing on all of his other claims, and he should be permitted to amend his pleadings to cure any procedural deficiencies.

 A PCRA petitioner is not entitled to an evidentiary hearing as a matter of right, but only where the petition presents genuine issues of material fact. Pa.R.Crim.P. 909(B)(2); *Commonwealth v. Harris*, 578 Pa. 377, 852 A.2d 1168, 1180 (2004). A PCRA court's decision denying a claim without a hearing may only be reversed upon a finding of an abuse of discretion. *Id.* Here, as Keaton has received a new

penalty phase based on the mitigating evidence issue, there is no need for a hearing on the remainder of his penalty phase claims. Furthermore, as none of his guilt phase claims entitle him to relief, no further purpose would have been served by a hearing, *see* Pa.R.Crim.P. 909(B)(2), and the PCRA court did not abuse its discretion in limiting the scope of the hearing to the single issue of mitigation evidence.

**Conclusion**

Having concluded there is a factual question regarding whether Keaton invoked his Fifth Amendment right to counsel on December 19, 1992, we remand to the PCRA court for determination of this issue and for the parties to address the applicability of *Shatzer* if the court determines Keaton did invoke his right. As to Keaton's remaining guilt phase claims, we affirm the PCRA court's denial of relief. We affirm the PCRA court's denial of *Atkins* relief and its grant of a new penalty phase on the basis of trial counsel's failure to investigate and present mitigating mental health evidence.

Order affirmed in part, reversed in part; case remanded for further proceedings consistent with this decision. Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the decision of this case.

Justice CASTILLE, Justices BAER, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a concurring and dissenting opinion.

Justice SAYLOR, concurring and dissenting.

I concur in the affirmance of the award of penalty relief but respectfully dissent as to the treatment of the broader category of guilt-phase claims. As to the latter claims category, I favor evidentiary development, consistent with my position as previously expressed elsewhere. *See, e.g., Commonwealth v. Smith,* 609 Pa. 605, 677–79, 17 A.3d 873, 915–17 (2011) (Saylor, J., dissenting). I continue to believe that the absence of an

adequate factual foundation for consideration of capital post-conviction claims encourages unwarranted analytical shortcuts in the appellate review.

For example, on the topic of reputation evidence, the majority suggests that the record was limited to personal opinions concerning Appellant's character. *See* Majority Opinion, at 715, 45 A.3d at 1074. However, there is no indication that Appellant had notice of such an asserted defect in his proffer and, hence, the opportunity to cure it. In this regard, the majority does not discuss the role of adequate pre-dismissal notice by the PCRA court, or the opportunity to amend contemplated by our procedural rules. *See* Pa.R.Crim.P. 905, 909(B)(2). Moreover, in the testimony which the PCRA court did allow, witnesses attested (albeit perfunctorily) to Appellant's good reputation in the community. *See, e.g.*, N.T., Oct. 2, 2002, at 88 (testimony of Kimberly Anderson).[1] To me, resolution of this claim should rest upon the weight of the evidence, as it relates to the prejudice criterion of the ineffectiveness inquiry.

My final comment pertains to the majority's perspective, derived from a previous dissent, that "[t]he strategy of focusing on a defendant's redeeming qualities, rather than painting him as the deranged product of a horrific background, is often a reasonable one." Majority Opinion, at 745, 45 A.3d at 1092 (citation omitted). For my own part, I do not find this sentiment to be useful or apt to our appellate review in the death-penalty arena. While a capital defense attorney certainly would not paint his client as deranged, the difficulty he often will encounter is that, by the time of the penalty stage in a capital case, the prosecution will already have established deplorable conduct on the part of the defendant to the satisfaction of the jurors beyond a reasonable doubt. Thus, the challenge facing counsel is to adduce some evidence to blunt the force of such conclusion, in terms of the degree of the

---

1. The majority's depiction of the declaration of Alberta Horton as going only to the time before Appellant began using drugs, *see* Majority Opinion, at 715 n. 16, 45 A.3d at 1074 n. 16, also appears to me to be inaccurate. *See* Affidavit of Alberta Horton, Dec. 5, 2000, at ¶ 4 ("Although [Appellant] still enjoyed a good reputation for peacefulness and nonviolence, he had begun to use drugs.").

defendant's moral culpability (as it relates to the jurors' selection between life imprisonment and death as the appropriate penalty). Death-penalty lawyers should certainly be aware of the perspective, held by some at least, that explanatory mitigation is the most effective means of doing this. *See, e.g., Simmons v. Luebbers,* 299 F.3d 929, 938–39 (8th Cir.2002) ("By the time the state was finished with its case, the jury's perception of Simmons could not have been more unpleasant. Mitigating evidence was essential to provide some sort of explanation for Simmons's abhorrent behavior. Despite the availability of such evidence, however, none was presented. Simmons's attorneys' representation was ineffective."). *See generally Commonwealth v. Brown,* 582 Pa. 461, 521, 872 A.2d 1139, 1174 (2005) (Saylor, J., dissenting) (discussing the differences between humanizing-and explanatory-type mitigation, as well as one court's observation that "[w]e have rarely granted habeas relief based solely upon humanizing, rather than explanatory, mitigation evidence in the face of extensive aggravating circumstances" (citation and quotation marks omitted)). Although such views may not be universal, they are unquestionably relevant in a scheme in which the vote of a single juror can foreclose a death verdict. *See* 42 Pa.C.S. § 9711(c).